731 A.2d 14

LINDA C. LOWE AND THOMAS LOWE, WIFE AND HUSBAND, PLAINTIFFS-RESPONDENTS, v. FARAMARZ C. ZARGHAMI, M.D., DEFENDANT-APPELLANT, AND KENNEDY MEMORIAL HOSPITAL, JOHN DOE, HENRY DOE, MICHAEL DOE, JAMES DOE, FRANCIS DOE, RICHARD DOE, STEPHEN DOE, LOUIS DOE, MARK DOE AND CHARLES DOE, DEFENDANTS.

Argued November 30, 1998—Decided June 7, 1999.

608

*Jerry Fischer*, Assistant Attorney General, argued the cause for appellant (*Peter Verniero*, Attorney General of New Jersey and *Budd, Larner, Gross, Rosenbaum, Greenberg & Sade* attorneys; *Mr. Fischer* and *Mary C. Jacobson* and *Joseph L. Yannotti*, Assistant Attorneys General, of counsel; *Karen L. Jordan*, Deputy Attorney General, on the briefs).

*Lawrence R. Cohan*, argued the cause for respondents (*Anapol, Schwartz, Weiss and Cohan*, attorneys).

*Abbott S. Brown* argued the cause for *amici curiae*, The New Jersey State Bar Association and The Association of Trial Lawyers of America–New Jersey (*Brown & Gold*, attorneys; *Mr. Brown* and *William L. Gold*, on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The basic issue in this case, as in *Eagan v. Boyarsky*, 158 *N.J.* 632, 731 *A.*2d 28 (1999), also decided today, is whether a clinical professor employed by the University of Medicine and Dentistry of New Jersey ("UMDNJ"), who practices medicine in a UMDNJ affiliated private hospital, is a public employee entitled to notice under the Tort Claims Act, *N.J.S.A.* 59:1–1 to –14–4 ("TCA").

## I.

### A. The Medical Malpractice Claim

On September 7, 1994, plaintiff, Linda Lowe, who was seeking treatment for cervical cancer, was referred to Dr. Zarghami by her personal physician. She saw Dr. Zarghami on two occasions in his office. On September 26, 1994, Dr. Zarghami performed a hysterectomy and a lymphadenectomy on Lowe at Kennedy Memorial Hospital–Stratford Division ("KMH"). At least two medical residents were present in the operating room. A week after her release from the hospital, Lowe experienced severe pain in her lower right back and had difficulty urinating. An x-ray revealed an obstruction to Lowe's right distal ureter. The obstruction, a metallic clip apparently left on Lowe's ureter after her hysterectomy, was removed by Dr. Jerome Pietras in December 1994. Approximately two days after that surgery, Lowe claims that Dr. Zarghami called and informed her the urologist found a metallic clip in her body. He also allegedly indicated the clip would not cause any problems.

Lowe had further surgery in January of 1995, so that Dr. Pietras could remove a plastic stent he had used to keep Lowe's ureter open. On February 2, 1995, Lowe was admitted to the KMH emergency room, and diagnosed with a urinary tract infection. In May 1995, doctors discovered hydronephrosis of Lowe's right kidney. Lowe returned to KMH in August 1995, and was diagnosed with a stricture of the right distal ureter. She underwent another operation. After an unidentified medical resident told Lowe that her problems may have resulted from poor medical care, she contacted an attorney. The attorney investigated the medical records, and informed Lowe in December 1995 that she might have a valid malpractice claim. The merits of the underlying claim are not at issue.

### B. Defendant's Employment with UMDNJ

In 1983, Dr. Faramarz Zarghami became an Assistant Professor of Clinical Obstetrics and Gynecology of the University of Medi-

cine and Dentistry of the State of New Jersey. Dr. Zarghami's employment is not evidenced by a formal written contract, but rather by two letters verifying his appointment as an Associate Professor. The letter regarding his reappointment as Assistant Professor of Clinical Obstetrics and Gynecology sets forth the duration of the appointment, the job level, and the status of his salary.

UMDNJ is a public entity entitled to the protection of the Tort Claims Act. UMDNJ enters affiliation agreements with private hospitals so that UMDNJ faculty, like defendant, may treat patients and instruct medical students in affiliated hospitals. Such affiliation agreements are provided for by statute. *See N.J.S.A.* 18A:64G–2. The affiliations provide places for UMDNJ to operate its faculty practice plans. Those faculty practice service plans, designed to complement the policies and development of UMDNJ, are intended to attract patients for teaching purposes, supplement faculty salaries, establish UMDNJ as a patient referral source, and allow UMDNJ faculty to retain and refine their clinical skills.

KMH, a private hospital, entered into an affiliation agreement with UMDNJ that required Dr. Zarghami to work at KMH in accordance with a faculty practice plan. Under that Agreement UMDNJ provided Dr. Zarghami with an office and office staff, in a building that the University either owned or leased, and arranged for him to have staff privileges at KMH. The University also billed for all patient treatment provided by Dr. Zarghami, and Dr. Zarghami's sole compensation consisted of an annual salary paid to him by UMDNJ. The University issued a W–2 Tax Form for Dr. Zarghami. UMDNJ participated in KMH's peer review committee, and the Chief of Obstetrics and Gynecology at KMH was also a UMDNJ employee.

Operating room activities, however, were governed by KMH procedures, and KMH provided the equipment, attending nursing staff, and anesthesiologist for the surgery. Under the affiliation agreement, UMDNJ billed plaintiff for all patient treatment provided by Dr. Zarghami, and KMH billed plaintiff for her hospital-

ization. Plaintiff's insurer paid those bills. Plaintiff claims that she never saw the bill from UMDNJ for her surgery because her medical bills were handled by her insurance company.

At the time of plaintiff's surgery, three classes of obstetrics and gynecology physicians practiced at KMH: (1) university doctors; (2) care source doctors, who are employed by the hospital; and (3) outside physicians in private practice.

Prior to Lowe's surgery, Dr. Zarghami met with Lowe in his office. The office building's sign indicates that it is a part of UMDNJ. Dr. Zarghami typically wears a badge indicating his affiliation with UMDNJ; however, he could not recall wearing the badge during his meeting with Lowe. Dr. Zarghami testified that the University requires him to disclose his faculty status to all potential patients, but he did not remember discussing his employment status with Lowe. Plaintiff, who worked as a nurse at KMH, claims in a signed affidavit that she was at all times unaware of defendant's employment relationship with UMDNJ.

C. Procedural History

Lowe filed a malpractice complaint against Dr. Zarghami and KMH on February 8, 1996. Dr. Zarghami delivered a copy of the complaint to UMDNJ on March 4. On April 19, 1996, Dr. Zarghami filed a motion to dismiss based on his status as a UMDNJ employee and Lowe's failure to provide notice within 90 days of the accrual of the claim as required by the Tort Claims Act. The court denied Dr. Zarghami's motion.

On July 19, 1996, Lowe filed a motion for leave to file a late notice of claim pursuant to *N.J.S.A.* 59:8–9 of the TCA. That section permits a court to allow a plaintiff to file a late notice of a claim under "extraordinary circumstances," if the motion is made within one year of the accrual of the claim. Alternatively, Lowe argued that Dr. Zarghami was not a state employee within the meaning of the Tort Claims Act. The court denied that motion, concluding that Lowe's claim accrued in December 1994, when she became aware that a foreign object had been left in her body after

the surgery. As a result, the motion had not been made within one year of the accrual of the claim. The court observed that even if the claim had not accrued until August 1995, this case did not present the extraordinary circumstances required to justify a late notice of claim.

Lowe sought partial reconsideration of the court's decision, asking the court to review again whether Dr. Zarghami was a state employee entitled to the protection of TCA. Dr. Zarghami moved for summary judgment. After a hearing, the court again denied the motion to file a late notice of a claim. On that same day, Dr. Zarghami's motion for summary judgment was granted.

Lowe sought interlocutory review of the order granting summary judgment, again contending that Dr. Zarghami was not a state employee. The Appellate Division granted interlocutory review and concluded that because Dr. Zarghami did not act under the control of UMDNJ when he operated on Lowe at KMH, a non-state institution, he acted as an independent contractor. *Lowe v. Zarghami*, 305 *N.J.Super.* 90, 97, 701 *A*.2d 961 (1997). Because the Tort Claims Act does not require a plaintiff to provide notice to the State's independent contractors, the court reversed summary judgment and remanded for trial. The court did not reach the question of extraordinary circumstances, because it concluded that Dr. Zarghami was not a public employee.

The Attorney General assumed responsibility for Dr. Zarghami's defense and filed a motion for leave to appeal the interlocutory order of the Appellate Division to this Court. The sole issue presented by that appeal was whether Dr. Zarghami was a state employee entitled to the protection of the TCA. Plaintiff did not file a cross-appeal. We granted defendant's motion for leave to appeal.

## II.

### A. The TCA

UMDNJ is a public entity entitled to immunity under the Tort Claims Act. *See Fuchilla v. Layman*, 109 *N.J.* 319, 330–31,

537 A.2d 652, *cert. denied sub. nom., University of Medicine and Dentistry of New Jersey v. Fuchilla,* 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). As initially enacted in 1972, the TCA did not extend immunity to public employees, nor were they protected by the notice requirements contained in the Act. However, in 1994 in response to this Court's ruling in *Chatman v. Hall,* 128 N.J. 394, 608 A.2d 263 (1992), that held that the notice requirements of the TCA are not applicable to actions brought against public employees, the Legislature amended the Act to extend to public employees the same degree of immunity the Act grants to public entities. *N.J.S.A.* 59:3–1c, now provides

> c. A public employee is not liable for an injury where a public entity is immune from liability for that injury.

The amendment also made the notice requirements under *N.J.S.A.* 59:8–3 applicable to both public entities and public employees. Under the TCA, a public employee is entitled to notice of a claim within 90 days of the accrual of a cause of action. *N.J.S.A.* 59:8–3, 8–8. A plaintiff must wait six months after the notice of claim is received before filing suit. *N.J.S.A.* 59:8–8. Those notice provisions, however, apply only if the worker is a public employee. The Tort Claims Act defines "employee" as follows:

> 'Employee' includes an officer, employee or servant, whether or not compensated or part-time, who is authorized to perform any act or service; provided, however, that the term does not include an independent contractor.
>
> [*N.J.S.A.* 59:1–3]

Courts use two different tests to distinguish employees from independent contractors.

## B. The Control Test

The control test is grounded in the common law master-servant relationship. *New Jersey Property–Liability Ins. Guar. Ass'n v. State,* 195 N.J.Super. 4, 8, 477 A.2d 826 (App.Div.), *cert. denied,* 99 N.J. 188, 491 A.2d 691 (1984). The master-servant relationship exists whenever the employer controls both the nature of the work performed and the manner in which the work is

completed. *Errickson v. Schwiers Co.*, 108 *N.J.L.* 481, 483, 158 *A.*
482 (E. & A.1932). On the other hand, an employer hires an
independent contractor to complete a particular task, but does not
direct the manner in which it is to be completed. *Ibid.* Drawing
on those principles, the control test assesses four factors in
determining a worker's status: (1) the degree of control exercised
by the employer over the means of completing the work; (2) the
source of the worker's compensation; (3) the source of the work-
er's equipment and resources; and (4) the employer's termination
rights. *Delbridge v. Office of the Public Defender*, 238 *N.J.Super.*
288, 320–21, 569 *A.*2d 854 (Law Div.1989) *aff'd* 297 *N.J.Super.* 1,
687 *A.*2d 748 (App.Div.1993); *New Jersey Property, supra*, 195
*N.J.Super.* at 14, 477 *A.*2d 826.

 The greater the degree of control exercised by the
employer, the more likely a worker will be considered an employ-
ee. The control test is satisfied whenever the employer retains
the right of control, even if the employer may not exercise actual
control over the worker. *Sloan v. Luyando*, 305 *N.J.Super.* 140,
148, 701 *A.*2d 1275 (App.Div.1997).

### C. Relative Nature of the Work Test

 The relative nature of the work test requires a court to
examine "the extent of the economic dependence of the worker
upon the business he serves and the relationship of the nature of
his work to the operation of that business." *Marcus v. Eastern
Agricultural Ass'n*, 58 *N.J.Super.* 584, 603, 157 *A.*2d 3
(App.Div.1959)(Conford, J. dissenting), *rev'g on dissent*, 32 *N.J.*
460, 161 *A.*2d 247 (1960). That test addresses

> various situations in which the control test does not emerge as the dispositive
> factor. For example, where it is not in the nature of the work for the manner of its
> performance to be within the hiring party's direct control, the factor of control can
> obviously not be the critical one in the resolution of the case, but takes its place as
> only one of the various potential indicia of the relationship which must be balanced
> and weighed in determining what, under the totality of the circumstances, the
> character of that relationship really is.
>
> [*Marcus, supra*, 58 *N.J.Super.* at 597, 157 *A.*2d 3 (Conford, J.A.D., dissenting).]

Although used primarily in workers' compensation cases, the New Jersey courts have found that the relative nature of the work test may sometimes be useful in other contexts. *New Jersey Property, supra,* 195 *N.J.Super.* at 11, 477 *A.*2d 826 (acknowledging that "there may be non-compensation cases involving social legislation where public policy considerations require that the control test be supplemented by the relative nature of the work standard"). Two New Jersey cases have relied explicitly on the relative nature of the work test to determine that workers are "employees" within the meaning of the Tort Claims Act. *Delbridge, supra,* 238 *N.J.Super.* at 323, 569 *A.*2d 854, held that designated *pro bono* attorneys acting on behalf of the Office of the Public Defender are "employees" under the Tort Claims Act. *Ibid.* The court reasoned that the creation of the Office of the Public Defender involved social legislation where public policy considerations required the application of the relative nature of the work test, even though the case arose under the Tort Claims Act. *Id.* at 321, 569 *A.*2d 854.

*Dunellen v. F. Montecalvo Contracting Co.,* 273 *N.J.Super.* 23, 28–30, 640 *A.*2d 1185 (App.Div.1994), applied the relative nature of the work test to determine that a borough engineer was entitled to indemnification under a borough ordinance adopted pursuant to *N.J.S.A.* 59:10–4. The control test was not an appropriate gauge because "as is the case with all professional employees, the governing body did not control the details of how [the engineer] performed ... services." *Id.* at 28, 640 *A.*2d 1185. The result in *Dunellen* implies that it is appropriate generally to apply the relative nature of the work test in situations involving work performed by professional employees. *Ibid. See also Wajner v. Newark Beth Israel Medical Center,* 298 *N.J.Super.* 116, 120–21, 689 *A.*2d 143 (App.Div.1997)(finding under both control test and relative nature of work test that medical students acting as staff-residents at affiliated UMDNJ hospitals are employees under Tort Claims Act).

■ The relative nature of the work test supplements the control test in limited circumstances. If a working relationship was created by social legislation under which public policy concerns dictate a more liberal standard, then a court may apply the relative nature of the work test rather than the control test. *Wajner, supra,* 298 *N.J.Super.* at 120, 689 *A.*2d 143; *Delbridge, supra,* 238 *N.J.Super.* at 321, 569 *A.*2d 854; *Dunellen, supra,* 273 *N.J.Super.* at 28–29, 640 *A.*2d 1185. Also, if the working relationship involves professional services where an employer cannot exercise control over the methods used to provide those services, the relative nature of the work test may provide a more accurate assessment of the working relationship. *Dunellen, supra,* 273 *N.J.Super.* at 28, 640 *A.*2d 1185.

### D. Applying the Tests

■ The cases suggest a tiered inquiry to determine whether a person is an "employee" under the Tort Claims Act. *New Jersey Property, supra,* 195 *N.J.Super.* at 10–11, 477 *A.*2d 826. If the court determines that a person is an employee under the control test, then the inquiry ends there. *Ibid.* If, however, the control test is inconclusive, then the court must determine whether it is appropriate to apply the relative nature of the work test. *Marcus, supra,* 58 *N.J.Super.* at 603, 157 *A.*2d 3 (Conford, J.A.D., dissenting).

■ When examined according to the four factors of the control test, defendant's status as an employee of UMDNJ is a close question. UMDNJ apparently exercised little control over the means by which defendant administered medical treatment to plaintiff and other patients. Defendant concedes that he did not inform UMDNJ of his plans to perform surgery on plaintiff, nor does it appear that he consulted with any other UMDNJ doctors. However, defendant's sole compensation was his UMDNJ salary, and UMDNJ furnished defendant with offices, staff, and other UMDNJ facilities. UMDNJ also retained the right to terminate

defendant, although a KMH oversight board retained control over defendant's staff privileges.

The Appellate Division found that KMH exercised greater control over defendant than did UMDNJ. *Lowe, supra,* 305 *N.J.Super.* at 95–96, 701 *A.2d* 961. We disagree. Applying the control test to defendant's relationship with KMH reveals that KMH resembled UMDNJ in its permissive approach to defendant's activities. Although defendant was required to schedule operating room time with KMH to perform surgery on plaintiff, defendant did not have to secure KMH approval for the surgery itself. Plaintiff emphasizes that KMH governed the days defendant performed surgery, and that KMH assigns nurses, assigns anesthesiologists, and designates labs to defendant. Plaintiff also emphasizes that defendant must follow KMH's rules regarding paperwork and other administrative procedures. However, those functions do not constitute control over the way in which defendant operated on plaintiff, or defendant's choice of treatment for his patients. Because KMH did not pay defendant for the work he performed, and KMH did not retain the right to end defendant's employment with UMDNJ, KMH did not exercise greater control over defendant than did UMDNJ. Neither UMDNJ nor KMH dictated how Dr. Zarghami exercised his professional judgment in treating plaintiff.

Indeed, UMDNJ employs practicing physicians as clinical instructors because UMDNJ expects those physicians to exercise independent, professional judgment while educating medical students and treating patients. The relative nature of the work test allows the Court to account for that "necessary exercise of independent judgment." The relationship between defendant and UMDNJ presents a clear case in which "it is not in the nature of the work for the manner of its performance to be within the hiring party's direct control." *Marcus, supra,* 58 *N.J.Super.* at 597, 157 *A.2d* 3 (Conford, J.A.D., dissenting). As in *Marcus,* it would be inconsistent with the nature of a physician's work for his employer to dictate the details of how he performed the practice of medi-

cine. 58 *N.J.Super.* at 597, 157 *A.*2d 3. As with other publicly employed professionals, control is "inimical to the task to be performed," since the nature of the work depends on the professionals' independent exercise of judgment. *Delbridge,* 238 *N.J.Super.* at 322, 569 *A.*2d 854 (finding public defender to be public employee though State could not exercise any control, because public defender was appointed to represent adverse parties); *Dunellen,* 273 *N.J.Super.* at 28, 640 *A.*2d 1185 (finding municipal engineer to be public employee although, as with all professional employees, governing body did not control details of how services were performed). Thus, we find that the relative nature of the work test is more appropriate than the control test to determine Dr. Zarghami's employment status.

We reach that conclusion not only because of the work Dr. Zarghami performed but also because of the public policy concerns expressed in UMDNJ's enabling legislation. The Legislature granted the Board of Trustees of UMDNJ broad authority over the conduct of the University. *N.J.S.A.* 18A:64G–6. The Board's use of that authority is "deemed to be public and essential governmental functions necessary to the welfare of the State and the people of New Jersey." *N.J.S.A.* 18A:64G–3. Included in the Board's powers is the authority to enter into agreements with both public and private organizations. *N.J.S.A.* 18A:64G–6(*l* ).

The Board used that authority to enter into affiliation agreements, under which full-time UMDNJ faculty participate in supplemental medical practices. The Board requires faculty to participate in those practice plans to broaden students' clinical experiences, to provide a supplemental source of funding for faculty salaries, to establish an in-State location for specialized care for New Jersey citizens, and to refine and retain clinical skills.

The public policy considerations expressed in the UMDNJ enabling legislation support a more liberal evaluation of the working relationships created by the University. Particularly important to that conclusion is the Legislature's desire to grant the

Board the "structural flexibility" necessary to maintain "productive and varied relationships with other health-care organizations." *N.J.S.A.* 18A:64G–2. In *Wajner,* the Appellate Division concluded that house-staff medical residents at affiliated hospitals were UMDNJ employees. *Wajner, supra,* 298 *N.J.Super.* at 121, 689 *A.2d* 143. Medical residents were subject to sufficient UMDNJ authority to satisfy the control test; however, the court also considered the relative nature of the work test. *Ibid.* The court observed that UMDNJ was created "through social legislation . . . to provide a superior academic health center, an educational tool for residents, and a research and patient care service." *Id.* at 120, 689 *A.2d* 143.

To accomplish those goals, the Legislature granted UMDNJ extensive autonomy, and the authority to place residents and faculty members in affiliated hospitals. Although residents are subject to strict control, the nature of the medical profession prevents UMDNJ from exerting substantial influence over faculty practice. The application of the limiting standards of the control test to the flexible working relationships designed by UMDNJ would significantly impair the faculty practice in affiliated private hospitals.

The liability limiting goals of the Tort Claims Act do not render the relative nature of the work test inapplicable. The Tort Claims Act was intended to limit the liability of public entities. *Brooks, supra,* 150 *N.J.* at 402, 696 *A.2d* 619. In 1994 the Act was amended to extend immunity from liability to public employees to the same degree that public entities are immune from suit. The amendment also applied the notice requirements of the TCA to public employees. *N.J.S.A.* 59:8–3. That amendment demonstrates a legislative intent to protect State employees and to limit the State's liability. The amendment also limits a public entity's exposure by providing a prompt opportunity to investigate the circumstances surrounding the dispute and settle meritorious claims. UMDNJ assumes responsibility for purposes of ordinary liability and malpractice insurance for faculty members practicing

at an affiliated hospital. In those circumstances, the TCA's liability limiting goals are best served by evaluating a worker's status under a liberal standard, thereby providing prompt notice in any dispute potentially involving a public employee.

The relative nature of the work test also considers the "extent of the economic dependence of the worker upon the business he serves." *Marcus, supra,* 58 *N.J.Super.* at 603, 157 *A.*2d 3 (Conford, J. dissenting). In *Wajner,* the Appellate Division concluded that medical residents were highly dependent upon UMDNJ, because the University paid their salaries. *Wajner, supra,* 298 *N.J.Super.* at 120, 689 *A.*2d 143. Like the residents in *Wajner,* Dr. Zarghami's sole source of compensation is a UMDNJ salary. UMDNJ furnishes Dr. Zarghami with an office, facilities and office staff. Furthermore, UMDNJ bills Dr. Zarghami's patients for his services, and pays the salaries of his office staff. Thus, the doctor is "economically dependent" upon the University not only because UMDNJ pays his salary, but also because UMDNJ assumes responsibility for all of the economic aspects of his practice.

In addition to economic dependence, the relative nature of the work test requires the Court to evaluate "the relationship of the nature of [the] work to the operation of that business." *Marcus, supra,* 58 *N.J.Super.* at 603, 157 *A.*2d 3 (Conford, J. dissenting). Any evaluation of a working relationship, therefore, must consider whether the goals of the business are served by concluding that the particular worker is an employee. UMDNJ's primary business is the education of medical students. The faculty practice plan creates opportunities for clinical faculty to both treat patients and instruct residents. At least two medical residents were present during Lowe's surgery. A second goal of the UMDNJ faculty practice plan is to create a patient-referral service. Another physician referred Lowe to Dr. Zarghami. UMDNJ intended faculty practices to provide a supplemental source of funds for faculty salaries. UMDNJ billed Lowe for her surgery, and was paid by Lowe's insurer.

If UMDNJ faculty practicing at affiliated hospitals are not public employees, then a number of the goals of the faculty practice program are defeated. First, the status of UMDNJ faculty members would be contingent on where they performed procedures. UMDNJ faculty treating patients in public hospitals would be public employees, and UMDNJ faculty treating patients in affiliated private hospitals would be independent contractors. Such a distinction would create confusion, and limit the accessibility of UMDNJ faculty for patient referrals. Second, if UMDNJ faculty operating in affiliated private hospitals are considered independent contractors, they may be personally liable for their malpractice. If personal liability becomes the rule, physicians may either decide to practice only in public hospitals, or eschew UMDNJ faculty status. Either result would limit the quality of UMDNJ doctors and reduce clinical opportunities for medical students. Third, if UMDNJ elects to indemnify faculty members practicing in private affiliated hospitals, then costs will increase. Rather than providing a new source of funding for faculty salaries, the faculty practice plan could drain resources from UMDNJ. Those factors weigh heavily in favor of concluding that Dr. Zarghami's operation on Lowe was part of a UMDNJ program under which the doctor must be considered a public employee.

Because Dr. Zarghami was totally economically dependent on UMDNJ and his work constituted an integral part of UMDNJ's business, both aspects of the relative nature of the work test are satisfied. Therefore, we conclude that UMDNJ faculty, like Dr. Zarghami, practicing in affiliated private hospitals are public employees.

That conclusion is supported by Attorney General Formal Opinion No. 23–1976. In 1976, the Attorney General issued Formal Opinion No. 23. The opinion found that the Board of Trustees of the College of Medicine and Dentistry [soon to be reorganized as part of the University of Medicine and Dentistry] was "clearly authorized" to establish faculty practice programs "calculated to enhance the clinical skills of the faculty, to provide a means to

supplement the patient population thereby increasing clinical education opportunities, and to supplement faculty income." The opinion stated that "professional activities undertaken by participating faculty physicians are considered within the scope of employment for purposes of ordinary liability and malpractice coverage."

The opinion described the features of the faculty practice plan and determined that the plans "are subject to all appropriate College regulations and are subject to all applicable State statutes and regulations in the same manner and degree as the College." The opinion also determined that "administrative, professional and clerical personnel working directly for the faculty practice plans are employees of the College rather than the individual plan." Moreover, "each person working for the faculty practice plan is entitled to all benefits normally accorded College employees including vacation and sick time, allowances, leave of absence, policies and pension benefits." UMDNJ and its employees have acted in reliance upon Formal Opinion 23–1976 for the past twenty-two years.

### III.

Because the Appellate Division held that Dr. Zarghami was an independent contractor, it did not reach the issue of whether "extraordinary circumstances" existed that justified Lowe's failure to file a timely notice of claim. However, that issue was decided by the trial court and was briefed and argued in this appeal. Accordingly, we now consider whether Lowe should be permitted to file a late notice of claim.

*N.J.S.A.* 59:8–9 provides that a claimant who fails to file notice of his claim within 90 days after the accrual of the cause of action, may in the discretion of the court, be permitted to file such notice at any time within one year after the accrual of his claim, provided that the public entity or public employee has not been substantially prejudiced.

In this case, Lowe, unlike Eagan, the plaintiff in *Eagan, supra,* 158 *N.J.* at 640, 731 *A.*2d at 32, did file her notice of late claim within one year after the accrual of her claim. Only after she underwent the August 1995 operation was she advised that her medical problems may have resulted from poor medical care. Prior to that time, she alleges that she was advised by Dr. Zarghami that the clip left in her body would not cause any problem. Dr. Zarghami in his deposition continued to contend that clips such as those placed in Lowe's body, "are intended to remain in the patient's body and should not be removed." On July 19, 1996, within one year after the accrual of her claim, Lowe filed her late notice of claim.

To justify the late filing, the claimant must present "extraordinary circumstances" for his failure to file the notice of claim within the ninety-day period following the accrual of a cause of action. Lowe argues that by practicing at affiliated private hospitals, UMDNJ faculty obscured their public employment. As public employees, those physicians are entitled to notice under the Tort Claims Act, but their patients are unaware that notice is required. As a result, the patient referral service created by UMDNJ may at times be unfair to those patients who are the victims of medical malpractice. Although that factor alone does not outweigh the economic dependence and policy goals that undergird our conclusion that Dr. Zarghami is a public employee, it should be considered in determining whether plaintiff has presented "extraordinary circumstances" that justify her failure to file a timely notice of claim.

Until 1994, the Tort Claims Act applied a fairly permissive standard when claimants sought to file notices of late claims. Claimants had to demonstrate only "sufficient reasons" for the delay, and that the State would not be prejudiced as a result. *N.J.S.A.* 59:8–9 (Comment). The Legislature enacted a more demanding standard when the TCA was amended in 1994 to require that the "sufficient reasons" for late filing must constitute

"extraordinary circumstances." *N.J.S.A.* 59:8–9, as amended by *L.*1994, *c.49* § 5.

Although that change in language "suggested that the amendment may have signaled the end to a rule of liberality," *Zois v. New Jersey Sports and Expo. Auth.,* 286 *N.J.Super.* 670, 675, 670 *A.*2d 92 (App.Div.1996), the new version "does not define what circumstances are to be considered 'extraordinary' and necessarily leaves it for a case-by-case determination as to whether the reasons given rise to the level of 'extraordinary' on the facts presented." *Allen v. Krause,* 306 *N.J.Super.* 448, 703 *A.*2d 993, (App.Div.1997); *Ohlweiler v. Chatham,* 290 *N.J.Super.* 399, 404, 675 *A.*2d 1176 (App.Div.1996); *O'Neill v. Newark,* 304 *N.J.Super.* 543, 551, 701 *A.*2d 717 (App.Div.1997); *Margolis and Novack, Claims Against Public Entities,* Comment to *N.J.S.A.* 59:8–9 at 161–62 (1999) (observing that pre–1994 rule that each case had to be determined on basis of its own facts will apply to 1994 amendment).

Few cases have applied the 1994 extraordinary circumstances amendment of *N.J.S.A.* 59:8–9 to determine whether the filing of a late claim is permitted. In *Ohlweiler,* the plaintiff, a public school teacher in Chatham, fell into an uncovered manhole while taking a group of students on a tour of the local sewage disposal plant. *Ohlweiler, supra,* 290 *N.J.Super.* at 400, 675 *A.*2d 1176. The plaintiff's injuries appeared to be limited to a sprained knee. *Id.* at 401, 675 *A.*2d 1176. She consulted an attorney, who informed her that there was no cause of action in the absence of a permanent injury. *Ibid.* After the 90–day notice period expired, the plaintiff discovered torn cartilage in her knee. *Ibid.* She then sought to file a late notice of claim. *Id.* at 402, 675 *A.*2d 1176. The court concluded that the plaintiff was "diligent and timely throughout in seeking both medical care and legal advice respecting her injury." *Id.* at 405, 675 *A.*2d 1176. Because the plaintiff's original injury was of a type that is usually transitory, and because she consulted both physicians and attorneys in a timely fashion, the court concluded that the "unusual, unanticipated, and unex-

pected" change in the plaintiff's condition constituted extraordinary circumstances. *Ibid.*

In *O'Neill, supra,* 304 *N.J.Super.* at 547–48, 701 *A.*2d 717, however, the Appellate Division refused to find extraordinary circumstances when a police officer was accidentally shot in the leg. The officer waited more than five months after the accident before consulting an attorney. The court concluded that the officer's failure to seek legal advice before the 90–day notice period expired precluded a finding of extraordinary circumstances. *Id.* at 552, 701 *A.*2d 717. The court observed that there was "no hint of a legislative intent that the time to give notice should be extended until the party discovers a public entity is involved." *Id.* at 552–53, 701 *A.*2d 717.

In *Allen v. Krause,* 306 *N.J.Super.* 448, 703 *A.*2d 993 (App.Div. 1997), the Appellate Division faced an issue similar to the one in this case. A consolidated appeal, *Allen* involved two surgeries performed by UMDNJ affiliated doctors at Robert Wood Johnson University Hospital. *Id.* at 450, 703 *A.*2d 993. Both plaintiffs sought to file a late notice of claim, contending that they were unaware of their respective physician's public employee status. *Ibid.* The trial court initially denied both motions, but, on reconsideration, permitted both late filings. *Ibid.* The Appellate Division granted leave to appeal in both cases. *Ibid.* The court affirmed the principle that "extraordinary circumstances" be determined on a case by case basis. The court observed that one defendant waited eleven months before contacting an attorney, and the other apparently received a letter indicating the doctor's UMDNJ affiliation. *Id.* at 451–52, 703 *A.*2d 993. However, relying on the lack of findings of fact and conclusions of law supporting the trial court's decision, the court remanded the cases for further proceedings. *Id.* at 453–54, 703 *A.*2d 993.

Nonetheless, as one commentator has observed, "[t]he court left open the possibility that the extraordinary circumstances test could be met where there was a delay in giving notice because although the plaintiff was aware of the identity of a public

employee that person's status as public employee was not apparent to or immediately discoverable by the plaintiff." *Margolis and Novack, supra,* Comment to *N.J.S.A.* 59:8–9 at 163.

Before the 1994 amendment, courts recognized that sufficient reasons could exist for the filing of late notice of claim where the public entity, intentionally or unintentionally, obscured the identity of the appropriate responsible public entity to be sued. In *Feinberg v. State, D.E.P.* 137 *N.J.* 126, 644 *A.*2d 593 (1994), plaintiff sought more specific information about the ownership of the Delaware and Raritan Canal but was thwarted by the original defendants who failed to disclose the identity of the responsible public entity for two years beyond the accrual of the claim. *Id.* at 135, 644 *A.*2d 593.

In *Zwirn v. County of Hudson,* 137 *N.J.Super.* 99, 347 *A.*2d 822 (Law Div.1975), plaintiff's counsel was misled unintentionally by county police officers about the ownership of the road where plaintiff's accident occurred. *Id.* at 101, 347 *A.*2d 822. Finding that the belief of plaintiff's counsel was reasonable, though mistaken, because county police officers had advised him it was a county road and because the death involved an accident that was exhaustively investigated by the county police and county prosecutor, the court found that plaintiff had sufficient reasons to file a late notice of claim with the State. *Id.* at 104–05, 347 *A.*2d 822.

In *Dambro v. Union Cty. Park Comm.,* 130 *N.J.Super.* 450, 327 *A.*2d 466 (Law Div.1974), the plaintiff's counsel sent a letter to the borough tax assessor describing the accident and requesting that he be informed about the owner of the property where plaintiff's accident occurred. *Id.* at 453, 327 *A.*2d 466. The tax assessor wrote back indicating that the property was owned by the County Park Commission. *Ibid.* It was only after plaintiff was served with the Commission's third-party complaint that he learned that Watchung owned the premises either in whole or in part. *Ibid.* Watchung moved to dismiss, but the court held that plaintiff had substantially complied with *N.J.S.A.* 59:8–4 and 59:8–7 and that the borough was estopped from relying on the notice provision

because the tax assessor had made a good faith mistake that misled the plaintiff's counsel concerning the borough's ownership. *Id.* at 457, 327 *A.*2d 466.

Although the exact identity of the tortfeasor, Dr. Zarghami, was known, his status as a public employee was obscured by his apparent status as a private physician. Plaintiff's failure to file a notice of claim arose not from any lack of diligence; to the contrary, plaintiff filed her claim within the two-year limitation period applicable to malpractice claims against a private physician. What is unusual in this case and in *Eagan v. Boyarsky, supra,* 158 *N.J.* at 638, 731 *A.*2d at 31, also decided today, is that unlike most cases involving public entities and public employees, the defendant-doctors were performing tasks associated generally with private practice and not public service.

The notice provisions of the Tort Claims Act were not intended as "a trap for the unwary." *Murray v. Brown,* 259 *N.J.Super.* 360, 365, 613 *A.*2d 502 (Law Div.1991). "Generally, we examine 'more carefully cases in which permission to file a late claim has been denied than those in which it has been granted, to the end that wherever possible cases may be heard on their merits, and any doubts which may exist should be resolved in favor of the application.'" *Feinberg,* 137 *N.J.* at 135, 644 *A.*2d 593 (quoting *S.E.W. Friel Co. v. New Jersey Turnpike Auth.,* 73 *N.J.* 107, 122, 373 *A.*2d 364 (1977)); *Randazzo v. Township of Washington,* 286 *N.J.Super.* 215, 668 *A.*2d 1083 (App.Div.1995). Not any one factor constitutes "sufficient reasons," but courts consider a combination of factors. *Lamb v. Global Landfill Reclaiming,* 111 *N.J.* 134, 149, 543 *A.*2d 443 (1988). Likewise, because "extraordinary circumstances" is an imprecise standard, each case will depend on its own circumstances.

The circumstances in this case qualify as "extraordinary." Lowe complied with all of the requirements of a typical malpractice claim. Unlike the plaintiff in *O'Neill,* Lowe contacted an attorney as soon as she became aware of the possibility of malpractice. There is no evidence supporting the conclusion that

Lowe knew Dr. Zarghami was a UMDNJ employee. Although Lowe was aware of the identity of the potential defendant, Lowe had no reason to suspect that her doctor was even associated with a public entity. The doctor's evidence to the contrary is unconvincing. He does not recall wearing his UMDNJ badge to his meeting with Lowe; he does not recall discussing his employment status. Although Lowe works as a nurse at KMH, there is no indication that she knew Dr. Zarghami, or was aware that UMDNJ doctors practiced in KMH, a private hospital.

Even assuming that Lowe knew Dr. Zarghami was a UMDNJ professor, she easily could have believed he was not acting as a public employee when practicing at KMH. As the record below indicates, there were three classes of doctors practicing in the hospital. *Ante* at 613, 731 *A.*2d at 27. Reasonable people, indeed, reasonable judges, disagreed on the employment status of UMDNJ professors practicing in private hospitals.

In view of all those facts, Lowe's case is like *Feinberg, supra,* 137 *N.J.* at 126, 644 *A.*2d 593; *Zwirn, supra,* 137 *N.J.Super.* at 99, 347 *A.*2d 822; and *Dambro,* 130 *N.J.Super.* at 450, 327 A.2d 466, where the unique facts of the case obscured the public employment of defendant. Like the plaintiff in *Ohlweiler,* Lowe contacted an attorney immediately and pursued her rights. She also sought prompt medical treatment. In this case, Lowe followed the procedures necessary to assert an ordinary medical malpractice claim against a physician. No evidence demonstrates that Lowe knew that those were not ordinary circumstances. The normal procedures for a malpractice claim unexpectedly proved inadequate because Dr. Zarghami was a UMDNJ professor. Coupled with the legal doubt surrounding the status of UMDNJ professors as public employees, this unanticipated revelation is sufficient to support a finding of extraordinary circumstances.

The *Ohlweiler* court considered the normally transitory nature of that plaintiff's injury to be a significant factor in finding extraordinary circumstances. Similarly, just as the normally transitory sprain unexpectedly proved more serious in *Ohlweiler,* the

normal procedure for medical malpractice claims unexpectedly proved inadequate in this matter.

A late notice of claim would not prejudice either Dr. Zarghami or UMDNJ. Dr. Zarghami forwarded the complaint to UMDNJ as soon as it was filed. Because Dr. Zarghami is required to keep medical records in the ordinary course of treating patients, investigation of Lowe's claim is not hindered by the delay in filing notice. Furthermore, Dr. Zarghami must have been aware of the possibility of a malpractice suit, given Lowe's repeated treatments, and the discovery of a foreign object in her body. Lowe should be permitted to file a late notice of a claim.

To resolve patients' doubts surrounding the employment status of their physicians, UMDNJ must require clinical professors employed by them to advise their patients, both orally and in writing, that they are employees of UMDNJ. Such notice should be given to a patient as soon as practicable. It also would be helpful if clinical professors' wore badges identifying themselves as UMDNJ employees. Those steps, if taken, together with this holding that clinical professors are UMDNJ employees, should make patients more aware that their physicians are public employees entitled to notice under the TCA.

## V.

The nature of the UMDNJ enabling legislation and the broad entitlement to notice enjoyed by public employees under the Tort Claims Act warrant applying the relative nature of the work test and determining that UMDNJ faculty practicing in affiliated private hospitals are public employees. As public employees, these doctors are typically protected by the notice provisions of the Tort Claims Act. Because of the specific facts of this case, however, we hold that this plaintiff presented extraordinary circumstances, under which late notice of a claim is permitted.

The judgment of the Appellate Division is reversed, and the case is remanded for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI STEIN and COLEMAN—6.

*Opposed*—None.