**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0033-21

Estate of ALHAM BARAKAT,
deceased, MORAD BARAKAT,
administrator of the Estate of
ALHAM BARAKAT,

      Plaintiff-Respondent,

v.

ROOSEVELT CARE CENTER AT
EDISON and MIDDLESEX
COUNTY IMPROVEMENT
AUTHORITY,

      Defendants-Appellants,

and

LOLA JOSEPH,

      Defendant.

_____

Argued February 1, 2022 – Decided July 29, 2022

Before Judges Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3187-21.

Richard J. Mirra argued the cause for appellants (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Benjamin H. Haftel, of counsel; Richard J. Mirra, of counsel and on the briefs).

Donald M. Stanzione argued the cause for respondent (Lombardi & Lombardi, PA, attorneys; Donald M. Stanzione, of counsel and on the brief).

PER CURIAM

Defendants Roosevelt Care Center at Edison (RCC) and Middlesex County Improvement Authority (County) appeal from the July 23, 2021 order of the Law Division granting leave to plaintiff Morad Barakat, Administrator of the Estate of Alham Barakat, to file a late notice of claim pursuant to N.J.S.A. 59:8-9, a provision of the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-1. We reverse.

I.

Morad[1] presented the following facts in his affidavit supporting his motion for leave to file a late notice of claim. Morad is Alham's adult son. On July 6, 2020, Alham was a patient at RCC, a facility operated by the County, when she became unresponsive. RCC personnel transferred Alham to a hospital for

---

[1] Because the Administrator and the decedent share a surname, we refer to them by their first names to avoid confusion.

2

treatment.  That same day, a representative of RCC contacted Morad to inform him of Alham's condition and hospital admission.  Alham was later transferred to another medical facility, where she died on August 1, 2020.  Morad "found out that [his] mother . . . had passed away from dysphagia due to anoxic brain injury as per the death certificate" issued on August 10, 2020.

In his affidavit, Morad stated that because of precautions associated with the COVID-19 pandemic he "was unable to meet and discuss this matter with any representative of [RCC] despite my requests to do so."  Morad did not identify the dates on which he requested to meet, the manner in which the requests were made, or if COVID-19 restrictions prevented him from communicating with RCC by methods other than an in-person meeting.  Morad also stated that he "requested a copy of the medical records pertaining to the stay of my mother" at RCC to "no avail . . . ."  He did not identify the date on which he made the request, to whom it was addressed, or the contents of any response he received.

On a date not specified in the record, Morad, acting without counsel, applied to the Surrogate Court for authorization to obtain a copy of Alham's medical records as Administrator of her estate.  He submitted the necessary paperwork via email, in light of COVID-19-related restrictions.  On November

9, 2020, the Surrogate issued an order to release Alham's medical records to Morad.

According to Morad's affidavit, on January 4, 2021, he obtained a copy of Alham's medical records from RCC and proceeded directly to his counsel's office. Morad's counsel submitted an affidavit stating that Morad retained his firm on January 4, 2021, "to obtain the medical records and have them reviewed by experts to determine whether the dysphagia was merely an unavoidable, unfortunate complication or whether there was any medical negligence in the happening and results of his mother's stay." Counsel's representation that he was retained to obtain medical records contradicts Morad's statement that he consulted counsel after RCC had given him a copy of those records. In his affidavit, counsel acknowledged that "[w]hen [his firm was] retained on January 4, 2021," he considered the TCA and determined "the ninety (90) day notice of claim period had expired."

On January 5, 2021, Morad's counsel mailed a letter to defendants styled as notice of a potential medical malpractice claim relating to Alham's death. The letter described the "details" of the potential claim as:

> The claimant, Estate of Alham Barakat, was unresponsive and no longer breathing while under the care of the facility. Further details may be supplied

A-0033-21

> upon receipt of the facility's medical records for 07/05/2020 through 07/06/2020.

Despite being aware that the ninety-day period had expired, the attorney did not seek leave to file a late notice of claim at that time.

Almost five months later, on May 20, 2021, defendants' counsel wrote to Morad's counsel stating that Morad was required to file a notice of claim within ninety days of Alham's death on August 1, 2020. Defendants' counsel stated that because the notice of claim was not filed until January 5, 2021, it was untimely. She requested Morad execute a stipulation of dismissal regarding all claims against RCC and the County.[2]

On May 26, 2021, Morad moved in the trial court pursuant to N.J.S.A. 59:8-9 for leave to file a late notice of claim. In an affidavit Morad stated, in addition to the facts noted above, that: (1) RCC never informed him of the cause of his mother's death; (2) he was "extremely limited with respect to visitation with" his mother because of precautions taken in response to the COVID-19 pandemic; (3) Alham was unresponsive after July 6, 2020, and could not communicate with him regarding the cause of her dysphasia; (4) he was unaware RCC was a public entity; and (5) he "was devastated as a result of the loss of

---

[2] It is unclear why defendants' counsel requested a stipulation of dismissal, as no action relating to Alham's death was pending in any court.

A-0033-21

[his] mother . . . and was not in a good emotional state for quite some time after her passing, complicated by the" COVID-19 pandemic. Defendants opposed the motion.

On July 23, 2021, the trial court issued an oral opinion granting the motion. The court, relying on our holding in Jeffrey v. State, 468 N.J. Super. 52 (App. Div. 2021), found "that pursuant to N.J.S.A. 59:8-8 the . . . accrual occurred on January 5th, 2021, the day after the plaintiff finally obtained his deceased mother's medical records from [RCC], the very day he retained counsel, who in turn immediately and diligently prepared and served a notice of claim on" defendants.[3] The court then reasoned Morad had until April 5, 2021, ninety days from January 5, 2021, to file a notice of claim.[4] Morad's filing of a notice of claim on what the judge found to be the accrual date should have resulted in a finding that the notice of claim was timely, mooting the motion.

The court, however, concluded that "the plaintiff has therefore shown, 'extraordinary circumstances' within the meaning and intendment of N.J.S.A.

_____

[3] Although the trial court found that Morad retained counsel on January 5, 2021, the record indicates he retained counsel the day before.

[4] The court also stated that the ninety-day period could be calculated beginning January 7, 2021, the day defendants received the notice of claim. It is not clear why the period in which to file a notice of claim would begin on the day that it was received by the relevant public entities.

59:8-9 . . . ." That provision, however, applies only where a party is seeking leave to file a late notice of claim. The court then made a number of findings relevant only if Morad's notice of claim had been untimely filed. For example, the court found that Morad "diligently and repeatedly attempt[ed] to obtain" Alham's medical records and retained counsel immediately upon receipt of the records. In addition, the court held that defendants had failed to demonstrate that they would be substantially prejudiced if the court granted "relief from the filing of the late tort claims notice and the plaintiff's tardiness, as is otherwise required under N.J.S.A. 59:8-9." Finally, the court held that

> because of the added authority and enhanced discretion vested in the trial courts by the Supreme Court's eleventh omnibus order of March 23, 2021, and those omnibus orders preceding it and/or incorporated by reference, "In recognition of the pervasion and severe effects of the COVID-19 public health crisis," the [c]ourt in this individual matter, and consistent with Rule 1:1-2(a), will extend the deadlines for the filing of a notice of claim, and "in a combination of the legitimate needs of the plaintiff, his attorney, and others, in the interest of justice."

A July 23, 2021 order grants Morad leave to file a late notice of claim and provides that the January 5, 2021 notice of claim "shall be deemed timely filed and served, nunc pro tunc, on and as of January 7, 2021."

A-0033-21

This appeal follows. Defendants argue the trial court erred: (1) when it found Morad's claims accrued on January 5, 2021; (2) misapplied the TCA; and (3) mistakenly exercised its discretion when it found that extraordinary circumstances warranted leave to file a late notice of claim.

II.

The TCA modifies the doctrine of sovereign immunity and establishes the parameters within which an injured party may recover for the tortious acts of public entities and employees. Feinberg v. Dep't of Envt'l Prot., 137 N.J. 126, 133 (1994). The statute's "guiding principle" is "that immunity from tort liability is the general rule and liability is the exception." D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 134 (2013) (quoting Coyne v. Dep't of Transp., 182 N.J. 481, 488 (2005) (internal quotations omitted)). The Act, therefore, "imposes strict requirements upon litigants seeking to file claims against public entities." McDade v. Siazon, 208 N.J. 463, 468 (2011).

Among those requirements is that the claimant, prior to initiating suit, file a notice of claim describing "[t]he date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted," along with other information. N.J.S.A. 59:8-4(a) to (f). The notice of claim

> shall be presented . . . not later than the 90th day after
> accrual of the cause of action. . . . The claimant shall

8

be forever barred from recovering against a public entity or public employee if:

a. The claimant failed to file the claim with the public entity within 90 days of accrual of the claim except as otherwise provided in [N.J.S.A.] 59:8-9 . . . .

[N.J.S.A. 59:8-8.]

N.J.S.A. 59:8-9 provides that

[a] claimant who fails to file notice of his claim within 90 days as provided in section 59:8-8 . . . , may, in the discretion of a judge of the Superior Court, be permitted to file such notice at any time within one year after the accrual of his claim provided that the public entity or the public employee has not been substantially prejudiced thereby. Application to the court for permission to file a late notice of claim shall be made upon motion supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his failure to file notice of claim within the period of time prescribed by section 59:8-8 . . . or to file a motion seeking leave to file a late notice of claim within a reasonable time thereafter . . . .

"Ascertaining the timeliness of a [TCA] notice requires a simple, three-step sequential analysis that never changes." McNellis-Wallace v. Hoffman, 464 N.J. Super. 409, 416 (App. Div. 2020) (citing Beauchamp v. Amedio, 164 N.J. 111, 118 (2000)). "The first step is to determine when the cause of action accrued in accordance with N.J.S.A. 59:8-1." Ibid. "The discovery rule is part and parcel of such an inquiry because it can toll the date of accrual." Ibid.

(quoting Beauchamp, 164 N.J. at 118). "Once the date of accrual is ascertained, one can proceed to the second step, which 'is to determine whether a notice of claim was filed within ninety days' as required by N.J.S.A. 59:8-8." Ibid. "'If not, the third task is to decide whether extraordinary circumstances exist justifying a late notice' under N.J.S.A. 59:8-9." Ibid. (quoting Beauchamp, 164 N.J. at 118-19).

"Accrual shall mean the date on which the claim accrued . . . ." N.J.S.A. 59:8-1. A claim accrues under the TCA "on the date of the accident or incident that gives rise to any injury, however slight, that would be actionable if inflicted by a private citizen." Beauchamp, 164 N.J. at 123. We review de novo the trial court's determination of an accrual date. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The accrual date of Morad's claim was, therefore, August 1, 2020, the date of Alham's death. The trial court misapprehended the law when, relying on our holding in Jeffrey, it found Morad's claims accrued on January 5, 2021. The plaintiff in Jeffrey suffered devastating injuries in a motorcycle accident. 468 N.J. Super. at 54. As the court explained,

> Plaintiff was twenty-five years old at the time of the accident. In one catastrophic event, he lost complete movement and sensation of his body. As described in his discharge summary from University Hospital, he

10

suffered from "tetraplegia" a medical term also known as quadriplegia, defined as a "complete paralysis of both the arms and legs that is usually due to injury." Using the medical terminology in his discharge summary, plaintiff has "no motor or sensory function," "no rectal tone," and requires a "Foley catheter in place for [a] neurogenic bladder."

[Id. at 57-58 (alteration in original).]

After the accident, the plaintiff required several surgeries. Id. at 54. He was subsequently transferred to a rehabilitation center, for six months of in-patient and outpatient rehabilitative therapy. Id. at 56. The accident left him "completely disabled and unable to perform rudimentary movements." Ibid. He uses a wheelchair for mobility, is unable to move his legs, and has minimal movement of his upper extremities. Ibid.

The plaintiff in Jeffrey did not consult an attorney until seven months after the accident when he received a bill for his medical treatment. Ibid. It was only then that he realized that the EMTs who treated him, who were employed by a public entity, may have exacerbated his injuries by lifting his body by his clothing rather than stabilizing his neck and back with a backboard. Id. at 55, 56. Before that consultation, the plaintiff did not know the identity of the first responders who treated him. Id. at 56. The trial court denied the plaintiff's

11

motion to file a late notice of claim, finding he produced insufficient evidence that his medical condition prevented him from filing a timely claim. Id. at 57.

We reversed, concluding that the trial court had "grossly misapprehended the magnitude of [the] plaintiff's injuries," and demanded too high a level of proof of his fragile emotional health in the months after the accident. Id. at 57. We held that

> a judge does not require psychiatric testimony to infer that [the] plaintiff's emotional state was, at the very least, extremely delicate and highly fragile. It would thus be beyond insensitive to impose a duty on plaintiff to seek legal advice through surrogates composed of family members or friends, during this life-altering adjustment period. We are certain the Legislature did not intend for the judiciary to construe the term "accrual" in N.J.S.A. 59:8-8 in a manner that abandons all vestiges of basic human empathy.
>
> [Id. at 58.]

We continued,

> [t]he time [the] plaintiff spent receiving inpatient treatment . . . was not exclusively devoted to his physical recovery. We do not require an explicit detailed account of the emotional and psychological trauma [the] plaintiff endured during this time period. It is self-evident that seeking an attorney to investigate the legal intricacies of a potential lawsuit was not among plaintiff's most pressing concerns during these emotionally difficult times.

A-0033-21

> After he completed the two-month inpatient program . . . [the] plaintiff was required to confront and adjust to the physical limitations associated with living as a quadriplegic. Although this radical shift from motorcyclist to quadriplegic wheelchair user in no way diminishes the value and dignity of [the] plaintiff's life, the inherent difficulties associated with this new reality cannot be viewed as a barrier to deny [the] plaintiff access to our civil courts.
>
> [Id. at 58-59.]

Finding that the trial court "mistakenly exercised [its] discretion by not giving proper consideration to the traumatic ramifications of the catastrophic, life-altering injuries [the] plaintiff suffered," we concluded his claims accrued on the day he met with his attorney seven months after the accident. Id. at 58.

Morad's loss of his mother, while undoubtedly a devastating event, is not of the same nature as the injuries suffered by the plaintiff in Jeffery. First, it was the plaintiff himself who was rendered totally disabled and in need of extensive medical care in Jeffrey. Morad is not the party who was injured by the alleged malpractice at issue here. While we do not intend to belittle Morad's grief, his suffering is secondary to the injuries caused by the alleged tortious act. In addition, the record establishes that Morad was functioning at a high level in the ninety days after Alham's death. He communicated with defendants, sought Alham's medical records, obtained her death certificate, and made a successful

13

application to the Surrogate Court. There is nothing in the record suggesting he was unaware of the potential medical malpractice claim or unable to contact counsel to explore legal claims during the ninety-day period.

Ninety days from August 1, 2020 was October 30, 2020. Morad did not attempt to file a claim until January 5, 2021. Because Morad filed the January 5, 2021 letter outside of the statutory period for doing so, it was a legal nullity. Rogers v. Cape May Cnty. Off. of the Pub. Def., 208 N.J. 414, 427 (2011). Although Morad's counsel concedes that he was aware on January 5, 2021, that the ninety-day period had expired, he did not file a motion for leave to file a late notice of claim until May 26, 2021, more than six months after expiration of the ninety-day period.

We turn then to whether the trial court's grant of leave to file a late notice of claim was warranted. The relevant period for our inquiry is from August 1, 2020, when the claim accrued, to May 26, 2021, when Morad moved for leave to file a late notice of claim. Only a claimant's demonstration of extraordinary circumstances justifies such leave. N.J.S.A. 59:8-9. We review the trial court's application of the extraordinary circumstances exception for an abuse of discretion. McDade, 208 N.J. at 476-77. "Although deference will ordinarily be given" to the trial court's fact findings, "the court's conclusions will be

14

overturned if they were reached under a misconception of the law." <u>D.D.</u>, 213 N.J. at 147.

Prior to the enactment of N.J.S.A. 59:8-9, to be granted leave to file a late notice of claim, a claimant needed only show "sufficient reasons" prevented the filing of a timely notice of claim. <u>Lowe v. Zarghami</u>, 158 N.J. 606, 625 (1999). The statute was amended in 1994 to include the extraordinary circumstances standard, which is "more demanding[,]" <u>id.</u> at 625-26, and "raise[d] the bar for the filing of a late notice" of claim, <u>Rogers</u>, 208 N.J. at 428. The party seeking leave to file a late notice of claim must show extraordinary circumstances. <u>Ventola v. N.J. Veterans' Mem'l Home</u>, 164 N.J. 74, 80 (2000).

The TCA does not define what constitutes "extraordinary circumstances," leaving "for a case-by-case determination . . . whether the reasons given rise to the level of 'extraordinary' on the facts presented." <u>Lowe</u>, 158 N.J. at 626 (citations and internal quotations omitted). As the Supreme Court explained,

> [t]he Legislature's grant of authority to trial courts to permit a late notice in the exercise of their discretion does not equate with a grant of authority to override the statute's declaration of purpose or to substitute a lesser standard of proofs for the extraordinary circumstances demanded by the 1994 amendment to the statute itself. Trial courts, in exercising their statutory authority, and appellate courts, in reviewing those decisions, must ensure that their decisions are faithful to the overall legislative framework in order that the statute's

essential purposes be preserved and not eroded through excessive or inappropriate exceptions. Courts faced with applications for leave to file a late notice of claim, therefore, must proceed with their evaluation mindful of the Legislature's direction that the proofs demonstrate circumstances that are not merely sufficient, but that they instead be extraordinary.

[D.D., 213 N.J. at 148-49.]

Morad's emotional distress at the death of his mother, while understandable, does not constitute extraordinary circumstances. To establish extraordinary circumstances, a claimant must demonstrate a medical condition during the period in which the notice was to be filed that, when viewed objectively, was "severe, debilitating, or uncommon" and prevented "attend[ing] to the filing of a claim." Id. at 150. The "stress and emotional strain that would quite ordinarily follow from learning" of a relative's death, which was not "of sufficient immediate concern . . . or . . . so significant in nature" to require medical care is insufficient to constitute extraordinary circumstances. Id. at 150-51.

Morad has not met this standard. He did not produce evidence that he was so distraught that he sought medical treatment or was hospitalized during the ninety-day period. To the contrary, Morad certified that after his mother's death, and before expiration of the ninety-day period, he was engaged in

16

communications with defendants seeking a meeting and the production of her medical records, obtained a copy of Alham's death certificate, and successfully petitioned the Surrogate Court for an order directing release of her records.

In addition, Morad offered no explanation for his counsel's failure to file a motion for leave to file a late notice of claim during the more than four-month period from January 4, 2021, to May 26, 2021. It appears counsel made the motion in response to the May 20, 2021 letter from defendants' counsel setting forth their position that the notice of claim had been filed late. The trial court suggested defendants' failure to promptly respond to the notice of claim excused Morad's delay in filing his motion. We disagree with this suggestion. Defendants had no obligation to prompt Morad to seek judicial relief to file his late notice. It is incumbent on a plaintiff, like Morad, whose counsel is aware that the ninety-day period has expired, to promptly seek leave to file a late notice of claim. Knowingly filing a late notice of claim to gauge the response of the relevant public entities is insufficient to constitute compliance with the TCA.

Finally, the trial court erred when it relied on the general limitations surrounding the COVID-19 pandemic to conclude Morad established extraordinary circumstances. While Morad alleges he was hindered in obtaining Alham's medical records because of the restrictions on in-person meetings at

17

RCC, we have already found that those medical records were not necessary to file a notice of claim.

The trial court also erred in its reliance on the Supreme Court's eleventh COVID-19 Ominbus Order (Order), issued on March 23, 2021, when granting Morad leave to file a late notice of claim. The provision of the Order on which the court relied provides:

> [i]n recognition of the pervasive and severe effects of the COVID-19 public health crisis, the court in any individual matter consistent with Rule 1:1-2(a) may suspend proceedings, extend discovery or other deadlines, or otherwise accommodate the legitimate needs of parties, attorneys, and others in the interests of justice . . . .

Rule 1:1-2(a) states in relevant part that:

> [t]he rules in Part I through Part VIII, inclusive, may be construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay. Unless otherwise stated, any rule may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice.

The Order authorizes courts to relax deadlines established in the court rules to accommodate attorneys, parties, and others in light of the COVID-19 public heath crisis. It does not, and likely cannot, see Winberry v. Salisbury, 5 N.J. 240, 243-48 (1950), and Rosenberg v. Town of N. Bergen, 61 N.J. 190,

18

199-200 (1972), authorize judges to alter statutory deadlines for asserting claims, particularly where, as in the case of the TCA, the Legislature has set clearly defined terms for the waiver of the State's sovereign immunity.

Because Morad did not demonstrate extraordinary circumstances for the late filing of the notice of claim we need not reach the question of whether defendants were substantially prejudiced by the late notice.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION