893 A.2d 32 (2006)
383 N.J. Super. 615
Elliot S. STOMEL, Esquire, Plaintiff-Appellant/Cross-respondent,
v.
The CITY OF CAMDEN, Gwendolyn Faison, The Camden City Council, Defendants-Respondents/Cross-appellants.
Mayor Milton Milan, Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 1, 2006.
Decided March 10, 2006.
*36 Alan H. Schorr argued the cause, Cherry Hill, for appellant/cross-respondent.
Cheryl L. Cooper argued the cause, Woodbury, for respondents/cross-appellants, City of Camden, Gwendolyn Faison, and Camden City Council (Holston, Mac-Donald, Uzdavinis, Eastlack & Ziegler, attorneys; Ms. Cooper, on the brief).
Respondent, Milton Milan, did not file a brief.
Before Judges CONLEY, WEISSBARD and WINKELSTEIN.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
Plaintiff Elliot Stomel was the public defender for the City of Camden (the City) from 1982 until 2000, when defendant Milton Milan, the mayor of Camden, terminated his employment. Plaintiff claims he was dismissed in retaliation for reporting an extortion attempt, and for providing testimony that implicated Mayor Milan in unlawful activity. He appeals from a summary judgment that dismissed his claims alleging violations of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, and his claim against the City for a violation of 42 U.S.C. § 1983.[1] His § 1983 claim against Mayor Milan proceeded to trial and a jury awarded plaintiff over $300,000 in damages.
On appeal, plaintiff seeks reinstatement of his CEPA claims and his § 1983 claim against the City. He also asserts that the City should be held responsible for his judgment against Mayor Milan under "principles of agency and vicarious liability." The City has filed a cross-appeal *37 from the Law Division's denial of its motion for counsel fees.
We have carefully considered the arguments of all parties in light of the facts and existing law. We affirm the dismissal of plaintiff's § 1983 claim against the City; the denial of defendants' request for counsel fees; and the Law Division's September 17, 2004 order that limited the judgment following the jury trial to Mayor Milan and denied plaintiff's application for judgment against the City. We reverse the summary judgment dismissing plaintiff's CEPA claim against the City.

I

THE FACTS
Plaintiff, an attorney, served as the City's municipal public defender from 1982 until he received a letter dated December 17, 1999, from Mayor Milan that said: "I have decided to appoint another lawyer as the Public Defender for the City of Camden, effective January 3, 2000, pending final City Council action. Therefore, please submit a final report and case status to [the City's business administrator] on or before Wednesday, December 29, 1999." Plaintiff had been employed under one-year contracts for seven of his years as the City's public defender, with the most recent contract covering the period November 1, 1997 to October 31, 1998.
The City paid plaintiff monthly; as of January 8, 1998, he was compensated at a rate of $30,000 per year. He negotiated his compensation with the court administrator or director and submitted a request for approval.
The parties stipulated that for the years 1996 through 2001, the City issued plaintiff 1099 tax forms, which stated that payment represented either "non-employee compensation" or "other income." From 1995 through 2001, plaintiff reported the compensation he received from the City to the federal and State government as client fees, not wages.
Plaintiff maintained his own law practice in Westmont; he had three employees. His business had its own federal tax identification number. Plaintiff, either individually or through his law firm, was responsible for payment of his secretarial and support staff salaries with no reimbursement from the City.
Plaintiff met with public defender clients at his own office on an average of twice a week. His office staff worked with the municipal court staff to coordinate the scheduling of appointments; the court staff informed the clients of their appointment times. Plaintiff appeared in court on behalf of public defender clients approximately once a week and made special appearances in conflict cases or when requested by the court director. Other than designated court sessions, plaintiff did not have a regular schedule with the City. While not required to account for his hours spent on each case, the City did require him to submit a letter each month documenting the number of public defender clients he represented, the dates he met with clients, and the dates of his court appearances.
As public defender, plaintiff "answered to" the court director, who scheduled plaintiff's court days. He did not, however, have a supervisor who reviewed his casework or dictated trial strategy, nor did he recall being given guidelines for managing his cases. He represented and advised his clients as he thought best without interference from anyone in City government.
Although plaintiff had access to the municipal court's telephone system, he was never issued an employee identification card and was not given an identification *38 number to access the City's computer system. He received no reimbursement from the City for office or travel expenses, and the City did not provide him with health or pension benefits. The City did not assign plaintiff a secretary or court clerk, or afford him office space. The municipal court staff did, however, provide plaintiff with the discovery necessary for his cases.
According to plaintiff, the facts leading to his removal from his position began in the fall of 1997, when he was solicited for a campaign contribution by Joseph Caruso, the Camden municipal prosecutor, on behalf of newly elected Mayor Milan. Plaintiff said Caruso told him he needed to pay $5,000 as a "contribution" to "guarantee" the public defender position in 1998. Plaintiff reported the solicitation to both local and federal authorities. At the direction of the Camden County Prosecutor's Office and with the assistance of the FBI, plaintiff made the $5,000 payment. In February 1998, plaintiff was reappointed as public defender.
The federal investigation resulted in Caruso's indictment. Plaintiff testified at Caruso's trial on December 7, 1999, directly implicating Milan. On December 17, 1999, three days after a mistrial was declared because the jury was unable to reach a verdict, plaintiff received the dismissal letter from Milan. Before receiving the letter, plaintiff had not received any complaints of poor job performance, and Milan did not recall any problems or concerns with plaintiff's performance as public defender. After plaintiff received the letter, the municipal court judge assigned public defender cases to other lawyers.
Faison became mayor in December 2000; she appointed a new municipal public defender in March 2001.
In granting defendants' summary judgment motion on plaintiff's CEPA claim, the court found that plaintiff was not an "employee" of the City; consequently, the judge did not reach the issue of whether plaintiff had established a prima facie case under CEPA. The court further found that, although plaintiff's § 1983 claim could proceed against Milan, the City could not be held liable for Milan's actions in dismissing plaintiff as public defender.
A jury awarded plaintiff $316,464.89 for his § 1983 claim against Milan, who is currently incarcerated in federal prison; plaintiff claims Milan is indigent.

II

STANDARD OF REVIEW
Summary judgment is warranted when "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995). On appeal, we first decide whether there was a genuine issue of fact, and if there was not, we determine whether the trial court's ruling on the law was correct. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). Like the trial court, we view the facts in the light most favorable to the plaintiff. Coyne v. Dep't of Transp., 182 N.J. 481, 491, 867 A.2d 1159 (2005).

III

THE § 1983 ACTION
On appeal, plaintiff claims the motion judge erred when he dismissed plaintiff's § 1983 claim. We disagree.
42 U.S.C. § 1983 provides, in pertinent part,

*39 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
This section does not create substantive rights, but rather provides a remedy for the violation of existing federal constitutional or statutory rights. Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir.2000). Both government contractors and government employees are protected from retaliatory termination for the exercise of First Amendment freedoms. Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 673, 116 S.Ct. 2342, 2346, 135 L.Ed.2d 843, 850 (1996).
The First Amendment's "guarantee of freedom of speech protects government employees from termination because of their speech on matters of public concern." Id. at 675, 116 S.Ct. at 2347, 135 L.Ed.2d at 852. Speech may be protected as involving a matter of public concern if it attempts to reveal actual or potential unlawful conduct or a breach of the public trust on the part of a government official. Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir.2001).
Here, defendants concede for purposes of the motion that plaintiff's speechhis report of the extortion attempt and his testimony at Caruso's trial that implicated Mayor Milanis protected as a matter of public concern. See id. at 194-95 (holding public employee's conduct and expression in internal investigation of employees at county prosecutor's office to expose potential wrongdoing constituted matter of public concern). That said, while we agree that plaintiff engaged in protected speech, and he may be able to show that Mayor Milan terminated his employment because of his exercise of that speech, plaintiff is unable to demonstrate that his removal from his position subjected the City to § 1983 liability because the decision to terminate his employment was not made by a policymaker with final authority to establish municipal policy with respect to the action ordered, or pursuant to a City policy or custom.
A municipality cannot be made liable for a deprivation of a federal constitutional right by application of the doctrine of respondeat superior. Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 636 (1978); Schneider v. Simonini, 163 N.J. 336, 370-71, 749 A.2d 336 (2000). A municipality can only be held liable for constitutional violations committed by an employee when the violation resulted from an official municipal "policy or custom." Schneider, supra, 163 N.J. at 371, 749 A.2d 336 (citing Monell, supra, 436 U.S. at 694, 98 S.Ct. at 2037-38, 56 L.Ed.2d at 638). As the United States Supreme Court has indicated:
[N]ot every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular officialeven a policymaking officialhas discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or *40 may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.... We hold that municipal liability under § 1983 attaches whereand only wherea deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.
[Pembaur v. City of Cincinnati, 475 U.S. 469, 481-84, 106 S.Ct. 1292, 1299-1300, 89 L.Ed.2d 452, 464-65 (1986) (emphasis added) (citations omitted) (footnotes omitted); see also Loigman v. Twp. Comm. of the Twp. of Middletown, 185 N.J. 566, 889 A.2d 426 (2006).]
Thus, for the City to be held liable for Milan's actions under § 1983, plaintiff must demonstrate that the decision to dismiss him represented official policy and that Mayor Milan had final authority to make that decision. See Pembaur, supra, ibid.
The term "official policy" often refers to formal rules or understandings that are intended to establish fixed plans of governmental action. Id. at 480-81, 106 S.Ct. at 1299, 89 L.Ed.2d at 463. A municipality cannot be held liable under § 1983 unless a plaintiff establishes the existence of an unconstitutional municipal policy. City of St. Louis v. Praprotnik, 485 U.S. 112, 128, 108 S.Ct. 915, 926, 99 L.Ed.2d 107, 121 (1988). An unconstitutional governmental policy may be inferred from a single decision "taken by the highest officials responsible for setting policy in that area of the government's business." Id. at 123, 108 S.Ct. at 924, 99 L.Ed.2d at 117. Nevertheless, proof of a single incident of unconstitutional activity is insufficient to impose municipal liability "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791, 804 (1985). "The `official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur, supra, 475 U.S. at 479, 106 S.Ct. at 1298, 89 L.Ed.2d at 463 (footnote omitted).
Identification of the policymaking official is a question of state law. Praprotnik, supra, 485 U.S. at 124, 108 S.Ct. at 924, 99 L.Ed.2d at 118. It is for the court, not the jury, to determine "which officials are high enough in the government that their actions can be said to represent a decision of the government itself." Id. at 126, 108 S.Ct. at 925-26, 99 L.Ed.2d at 120.
Here, plaintiff has failed to make a prima facie showing that first, Mayor Milan had the final authority to terminate plaintiff's employment; and, second, that he did so pursuant to an official municipal policy.
At the time he was terminated, plaintiff held his position as municipal public defender pursuant to New Jersey's Municipal Public Defender Act, N.J.S.A. 2B:24-1 to -17 (the MPDA). That legislation, effective March 23, 1998, provided, among other things, that a municipal public defender is appointed by the municipality's governing body, N.J.S.A. 2B:24-3, and "shall serve for a term of one year from the date of his appointment, and may continue to serve in office pending reappointment or appointment of a successor." N.J.S.A. 2B:24-4a. No dispute exists that under a Faulkner Act mayor-council form of government, see N.J.S.A. 40:69A-31 to -48, like that in the City of Camden, a municipal public defender may not be appointed *41 in the absence of a resolution of the city council. The question here is whether Mayor Milan, in the absence of a resolution by the Camden City Council, had the authority to remove plaintiff. We conclude that just as a municipal public defender may not be appointed without approval of the city council, neither may the public defender be removed without that same approval.
The MPDA provides procedures to remove a public defender.
In addition to any other means provided by law for the removal from office of a public official, a municipal public defender may be removed by the governing body of a municipality for good cause shown and after a public hearing, and upon due notice and an opportunity to be heard. Failure to reappoint a municipal public defender for a second and subsequent term does not constitute a "removal from office" within the meaning of this subsection.
[N.J.S.A. 2B:24-4e (emphasis added).]
A municipal public defender's employment may therefore be terminated in two ways: first, when he or she is not reappointed, and second, upon action of the municipality's "governing body." Here, even if we assume, without deciding, that plaintiff was removed rather than simply not reappointed, his removal was not by the governing body, but solely by the Mayor.
While the term "governing body" is not defined in the Faulkner Act and has been interpreted in different ways depending upon the circumstances, In re Shain, 92 N.J. 524, 535, 457 A.2d 828 (1983), the legislative history of the Faulkner Act provides guidance as to how it should be construed under the MPDA. For instance, in the Governor's Reconsideration and Recommendation Statement to Senate, No. 1206-L. 1985, c. 374, he expressed his opposition to defining the term "governing body" in the Faulkner Act. He said,
I am opposed to defining the term "governing body" in mayor-council Faulkner Act municipalities to include both the mayor and the municipal council.... Current law adequately and clearly expresses the form of government in question, and to infer that the mayor is a member of the governing body is misleading in that he has no voting rights and, indeed, need not attend council meetings.
[See N.J.S.A. 40:69A-32.]
Another indicium of the limitations on a Faulkner Act mayor's authority is found by comparing the Preliminary Statement of the Commission on Municipal Government with subsequent proposals. In doing so, the New Jersey Supreme Court has posited the following:
The Mayor-Council plans proposed by the Commission ... were originally entitled the "Strong-Mayor Plans." See Local Self Government in New Jersey: A Proposed Optional Charter Plan, Preliminary Statement of the Commission on Municipal Government, at 35-42 (1948). The adjective "strong" was dropped in subsequent proposals, perhaps suggesting an intent to de-emphasize the Mayor's powers vis-à-vis the Council.
[In re Shain, supra, 92 N.J. at 531 n. 7, 457 A.2d 828.]
In addition, the Faulkner Act gives the city council authority to remove "any municipal officer for cause," N.J.S.A. 40:69A-36e; see also In re Shain, supra, 92 N.J. at 531, 457 A.2d 828. A mayor's authority to remove municipal officers is more constrained; his or her removal authority is limited to municipal department heads, as well as other "executive" officers, but that authority is "subject to any general *42 provisions of law concerning term of office or tenure," and only after the mayor first files a notice of intention to do so with the city council, which has the authority to disapprove the removal. N.J.S.A. 40:69A-43(c); see also DeSoto v. Smith, 383 N.J.Super. 384, 391-92, 891 A.2d 1241 (App.Div.2006).
Given this legislative design, we conclude that for purposes of the MPDA it is the city council, not the mayor, that constitutes the "governing body" authorized to remove a municipal public defender appointed under the MPDA. That, here, Mayor Milan testified at his deposition that he believed he had the authority to remove the public defender, does not make it so.
To represent an act of official government policy, a decision to adopt a particular cause of action must be "properly made" by a local government's authorized decision maker. Pembaur, supra, 475 U.S. at 481, 106 S.Ct. at 1299, 89 L.Ed.2d at 463-64. Justice White, in his concurring opinion in Pembaur, said: "Where the controlling law places limits on their authority, [decision makers] cannot be said to have the authority to make contrary policy." Id. at 486, 106 S.Ct. at 1301, 89 L.Ed.2d at 467. Thus, because here, only the Camden City Council could have terminated plaintiff's employment, the Mayor's decision to do so was not "properly made" by an "authorized decision maker." Hence, while Mayor Milan may have incurred personal liability for his conduct, his actions were not chargeable to the City.
The written contracts between plaintiff and the City also highlight this point. The contracts say "the City" has the right to terminate the contracts, either for cause, or at the City's convenience, upon notice to plaintiff. The contracts did not give that authority to the Mayor.
The other reason plaintiff failed to establish a prima facie § 1983 claim against the City is that he has not shown the existence of an unconstitutional municipal policy for which the City could be liable. The action taken by Mayor Milanplaintiff's removalwas the Mayor's alone. The City Council was not involved in the Mayor's decision. That the City Counsel may have tacitly allowed the Mayor to proceed as he did is not sufficient to constitute an unconstitutional policy for purposes of a § 1983 violation. Cf. Praprotnik, supra, 485 U.S. at 130-31, 108 S.Ct. at 928, 99 L.Ed.2d at 122-23 (mere failure to investigate subordinate's discretionary decisions not a delegation of policymaking authority; "ad hoc searches for officials possessing ... `de facto' authority would serve primarily to foster needless unpredictability in application of § 1983"); see also Tuttle, supra, 471 U.S. at 823-24, 105 S.Ct. at 2436, 85 L.Ed.2d at 804 ("word `policy' generally implies a course of action consciously chosen from among various alternatives," attributable to municipal policymaker) (footnote omitted). Thus, plaintiff has failed to establish an official policy that led to his removal.
To support his position, plaintiff relies on Sunkett v. Misci, 183 F.Supp.2d 691 (D.N.J.2002), and Bowles v. City of Camden, 993 F.Supp. 255 (D.N.J.1998). For the following reasons, neither is on point.
In Sunkett, an assistant Camden city attorney was terminated from his position in the city law department by the mayor and the attorney's superiors after the attorney criticized as illegal his superiors' decision to remove a certain building from the city's foreclosure list. Id. at 699-700, 708-09. The attorney brought suit against the mayor, the city attorney, and the first assistant city attorney, alleging retaliatory discharge in violation of CEPA, and a *43 First Amendment violation under § 1983. Id. at 708, 715. The court denied the mayor's and the city's motion for summary judgment because there was no "serious contention" that the mayor lacked final authority to terminate the City attorney. Id. at 711. That was so because the defendant attorneys and the mayor had final authority to fire the plaintiff who was an at-will employee in the city's law department. Id. at 709, 711. Not so here. Even if plaintiff may be considered an employee for CEPA purposes[2], he was not a member of the City's law department, which is under the authority of the City attorney, and ultimately the mayor. See, inter alia, N.J.S.A. 40:69A-43(c). In other words, unlike in Sunkett, Mayor Milan did not have the statutory authority to remove plaintiff.
Plaintiff's reliance on Bowles is equally misplaced. In Bowles, supra, the then-mayor of Camden terminated the plaintiff from his position as director of Camden's Public Works Department a few months after the plaintiff agreed to cooperate with a criminal investigation into the department. 993 F.Supp. at 257, 263. The plaintiff brought suit against the mayor, the city, individual members of the city council, and the business administrator for the city, alleging retaliatory discharge under CEPA, and a First Amendment violation under § 1983. Id. at 257-58. The court found that the plaintiff presented a genuine issue of fact as to whether his cooperation with the investigation was a substantial or motivating factor in the mayor's decision to fire him, and thus allowed the § 1983 claim to proceed against both the mayor and the city. Id. at 267-69. There, however, Bowles, as a city department head, was statutorily subject to removal by the mayor. N.J.S.A. 40:69A-43(c). That, like Sunkett, is substantively different from the case at hand.
In sum, because Mayor Milan did not possess the authority to terminate plaintiff's employment, and because plaintiff has been unable to point to any unconstitutional policy or custom engaged in by the City's governing body, plaintiff failed to make a prima facie showing of § 1983 liability against the City and that claim was properly dismissed.

IV

THE CEPA CLAIM
The trial judge dismissed plaintiff's CEPA claim on the grounds that plaintiff was not an employee. We disagree.
N.J.S.A. 34:19-3 provides, in part, that "[a]n employer shall not take any retaliatory action against an employee" who undertakes certain protected conduct. An employee is defined in CEPA as "any individual who performs services for and under the control and direction of an employer...." N.J.S.A. 34:19-2b. This statute "does not necessarily exclude workers who might be classified at common law as independent contractors." D'Annunzio v. Prudential Ins. Co. of Am., 383 N.J.Super. 270, 277, 891 A.2d 673 (App.Div.2006).
Different tests, each bearing upon the degree of control an employer exercises over an individual, are used by New Jersey courts to determine whether an individual qualifies as an employee. Under the control test, the factors to be considered include "(1) the degree of control exercised by the employer over the means of completing the work; (2) the source of the worker's compensation; (3) the source of the worker's equipment and resources; and (4) the employer's termination rights." Lowe v. Zarghami, 158 N.J. 606, 616, 731 A.2d 14 (1999). A second test is described as the "relative nature of the work test." Id. at 616, 731 *44 A.2d 14. That test is generally applied "in situations involving work performed by professional employees." Id. at 617, 731 A.2d 14. The test "requires a court to examine `the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business.'" Id. at 616, 731 A.2d 14 (quoting Marcus v. E. Agric. Ass'n, 58 N.J.Super. 584, 603, 157 A.2d 3 (App.Div.1959) (Conford, J., dissenting), rev'g on dissent, 32 N.J. 460, 161 A.2d 247 (1960)); see also Delbridge v. Office of the Pub. Defender, 238 N.J.Super. 288, 319-23, 569 A.2d 854 (Law Div.1989) (holding designated counsel acting on behalf of the office of public defender in law guardian program to be public employees for purpose of the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to -12-3, and therefore entitled to indemnification by the State).
While neither Lowe nor Delbridge involved CEPA claims, they are instructive. In Lowe, supra, the Court concluded that the relative nature of the work test was more appropriate than the control test to determine whether a clinical professor employed by the University of Medicine and Dentistry in New Jersey, who practiced medicine in an affiliated private hospital, was a public employee because the nature of the doctor's work necessarily involved an exercise of independent, professional judgment. 158 N.J. at 620, 731 A.2d 14. The Court held that if the working relationship was "created by social legislation under which public policy concerns dictate a more liberal standard, then a court may apply the relative nature of the work test rather than the control test." Id. at 618, 731 A.2d 14.
In Delbridge, supra, after the court first looked to the factors of the control test, the court recognized that the degree of control the employer retains over a worker's job task did not fit a public defender analysis because the "essence of their representation... is independence of judgment in carrying out their responsibilities to their clients." 238 N.J.Super. at 320, 569 A.2d 854. The court explained that in such a situation, the control test should be supplemented by the broader "relative nature of the work test," which focuses on the "extent of the economic dependence of the worker on the business and the relationship of the nature of the work to the operation of the business." Id. at 321-22, 569 A.2d 854.
While control is an element that is generally important to determine whether an employer-employee relationship exists, "[it] is not the be-all and end-all of the inquiry." Pelliccioni v. Schuyler Packing Co., 140 N.J.Super. 190, 199, 356 A.2d 4 (App.Div.1976). "[W]here the type of work requires little supervision over details for its proper prosecution and the person performing it is so experienced that instructions concerning such details would be superfluous, a degree of supervision no greater than that which is held to be normally consistent with an independent contractor status might be equally consistent with an employment relationship." Marcus, supra, 58 N.J.Super. at 597, 157 A.2d 3.
Against this legal framework, we conclude that in addition to consideration of the degree of control the City exercised over plaintiff's work, the relative nature of the work test is also applicable. Plaintiff's work as an attorney was that of a professionalhe alone could give legal advice and represent his clients without supervision from the City. The nature of his work required him to exercise his independent, professional judgment. A simple application of the control test would be inappropriate under these circumstances.
The legislature has recognized that municipal public defenders are "a critical component of New Jersey's system for *45 the administration of justice and the effective, fair and equal representation of the poor." N.J.S.A. 2B:24-1a. Municipal public defenders are required in every municipality in this state. N.J.S.A. 2B:24-1d. A New Jersey municipality must fill the position. Thus, the parties' working relationship, "created by social legislation," demands a liberal standard be applied in assessing the nature of plaintiff's position with the City. See Lowe, supra, 158 N.J. at 618, 731 A.2d 14. In doing so, we conclude that the character of the relationship between the City and plaintiff was that of employer-employee.
As noted, the City is required to provide a public defender. In filling that position, plaintiff's employment required him to represent clients assigned to him by the City, and to appear in court at designated times. While he maintained his own private business with his own support staff, he was paid by the City with a monthly check based on a yearly salary. He was not paid individually for the representation of each client. That the City chose to provide him with a 1099 form, rather than a W-2 form, is merely a factor to be considered, and is by no means controlling.
Plaintiff performed essentially the same duties for the City for approximately seventeen years; he was not free to choose his own clients on behalf of the City, and he was required to submit written reports detailing his court sessions and duties performed. Under the terms of his contract, he could not be paid until the City Law Department certified that his work was done satisfactorily. According to plaintiff, the municipal court made appointments for indigent persons to meet with him. These facts are indicia of an employer-employee relationship.
Finally, and significantly, CEPA, as well as the MPDA, is social legislation. Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431, 650 A.2d 958 (1994). It is remedial legislation designed to protect employees who report illegal or unethical workplace activities. Estate of Roach v. TRW, Inc., 164 N.J. 598, 610, 754 A.2d 544 (2000). The legislation provides "`broad protections against employer retaliatory action' for workers whose whistle-blowing actions benefit the health, safety and welfare of the public...." D'Annunzio, supra, 383 N.J.Super. at 280, 891 A.2d 673 (quoting Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179, 707 A.2d 1000 (1998)). "CEPA's overarching intent [is] to provide broad protection to workers who report unlawful activities in the workplace." Id. at 281, 891 A.2d 673. Here, plaintiff's whistle-blowing about the extortion attempt benefited the public and deserves CEPA's broad protection. Considering plaintiff an employee under these circumstances will foster CEPA's purposes. Accordingly, we reverse the order dismissing plaintiff's CEPA claim.
The trial judge dismissed the CEPA claim based solely on his conclusion that plaintiff was not an employee. We therefore do not address whether plaintiff has made a prima facie case for entitlement to damages under CEPA; that issue should first be addressed in the Law Division. Consequently, we reinstate plaintiff's CEPA claim and remand for further proceedings consistent with this opinion.

V

WHETHER THE CITY SHOULD BE HELD LIABLE FOR MILAN'S JUDGMENT UNDER PRINCIPLES OF AGENCY AND VICARIOUS LIABILITY
Plaintiff argues in his brief that the City should be responsible for the judgment arising out of plaintiff's jury verdict against Milan. Given that a municipality cannot be held liable under § 1983 on a respondeat superior theory, Monell, supra, *46 436 U.S. at 691, 98 S.Ct. at 2036, 56 L.Ed.2d at 636, and our conclusion that plaintiff may not maintain his § 1983 claim against the City, his arguments on this issue are without merit and do not require further discussion. R. 2:11-3(e)(1)(E).

VI

DEFENDANTS' CROSS-APPEAL FOR COUNSEL FEES
Defendants' cross-appeal for counsel fees is without merit and does not warrant discussion in a written opinion. Ibid.

VII

SUMMARY
We reverse that portion of the summary judgment that dismissed plaintiff's CEPA claim. In all other respects, we affirm the Law Division's summary judgment order and the September 17, 2004 order of judgment following the jury trial.
Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.
NOTES
[1] Plaintiff does not appeal from the summary judgments in favor of Mayor Faison, who replaced Mayor Milan, or the Camden City Council.
[2] See Section IV of this opinion, infra.