NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4627-13T4

LEONIDES VELAZQUEZ,

     Plaintiff-Appellant,

v.

CITY OF CAMDEN and OFFICER
ALEXIS RAMOS,

     Defendants-Respondents.

_____

> APPROVED FOR PUBLICATION
>
> September 14, 2016
>
> APPELLATE DIVISION

Argued October 5, 2015 — Decided  September 14, 2016

Before Judges Sabatino, Accurso and
O'Connor.

On appeal from Superior Court of New Jersey,
Law Division, Camden County, Docket No. L-1350-10.

Mark B. Frost argued the cause for appellant
(Mark B. Frost & Associates, attorneys; Ryan
Lockman, on the brief).

John C. Eastlack, Jr. argued the cause for
respondent City of Camden (Weir & Partners,
LLP, attorneys; Mr. Eastlack, on the brief).

John C. Connell argued the cause for
respondent Officer Alexis Ramos (Archer &
Greiner, attorneys; Mr. Connell and Kate A.
Sozio, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Plaintiff Leonides Velazquez appeals from the jury's no cause verdict in his New Jersey Civil Rights Act action against defendant Alexis Ramos, a Camden police officer who shot Velazquez twice in the torso outside his home in the course of responding to a domestic disturbance call. Plaintiff also appeals from the involuntary dismissal of his case against Ramos' employer, co-defendant City of Camden, at the close of plaintiff's case pursuant to Rule 4:37-2, and the court's order denying his motion for new trial as to both defendants pursuant to Rule 4:49-1.

Plaintiff raises three issues on appeal. He claims the court erred in allowing an assistant prosecutor to testify he determined, after reviewing the investigation conducted, not to criminally prosecute Ramos, by excluding all references to Ramos' mental health records and by excusing a juror before deliberations. Because we agree the prosecutor should not have been allowed to testify that Ramos was not criminally charged, and conclude that Ramos' mental health records were relevant to his perception of events on the night of the shooting, and thus to both his credibility and the reasonableness of his

perceptions and conduct, we reverse the verdicts in favor of both defendants and remand for a new trial.[1]

Although the parties presented extensive testimony from the several eyewitnesses, the essential facts are easily summarized. The jury heard testimony that plaintiff was standing outside his home in Camden with one of his sisters when his girlfriend's mother and sister drove up in a van shortly after 1:00 a.m. on January 2, 2009. The two women began yelling and cursing at plaintiff, accusing him of hitting his girlfriend and breaking a window at her home. The girlfriend's mother was standing half in and half out of the driver's seat yelling at plaintiff, who stood about ten feet away. Plaintiff was yelling back at both women. The argument was apparently quite loud and conducted in both English and Spanish.

Hearing the commotion, plaintiff's mother and another sister came outside. Plaintiff testified that after threatening to have someone beat him up, the girlfriend's sister got out of the van and picked up a rock from a tree garden in plaintiff's yard. According to plaintiff, his mother and two sisters, she returned to the van and threw the rock at plaintiff. The rock

---

[1] Plaintiff's third issue does not warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E). The court acted well within its discretion in excusing before deliberations, a juror who recognized a testifying witness. See R. 1:8-2(d)(1); State v. Jenkins, 182 N.J. 112, 123 (2004).

did not hit plaintiff, as his mother deflected it with her hand. Plaintiff testified he bent to pick up the rock thrown at him. As he stood up, rock in hand, Ramos appeared and shot him. Plaintiff acknowledged his blood alcohol content at the time of the fight was .16, but testified he did not feel drunk.

Although neither the girlfriend's sister or mother could remember the sister throwing a rock at plaintiff, both admit the argument and recall seeing plaintiff with a rock in his hand just before he was shot.

A neighbor testified she was sitting on her porch when the argument broke out. Moving to the sidewalk to get a better view, she saw one of the women bend down, grab a rock and walk around the van and open the door. As that was happening, "[c]ops was pulling up. They parked — he parked across the street. The girl threw the rock. [Plaintiff] bent down to grab the rock and as he came up, the police shot him like two or three times."

Although describing the "rock" variously as a rock or a brick,[2] both plaintiff and his family as well as the girlfriend's family all agreed with the neighbor that the rock fit into the palm of plaintiff's hand. None of the witnesses testified that plaintiff was holding the rock over his head.

---

[2] The "rock" was apparently a broken piece of landscaping brick.

Ramos testified he was on duty preparing to write parking tickets when he heard the communications operator dispatch two patrol units to a large fight nearby. Although he was not dispatched to the scene, he drove on his own initiative to the address where the fight was reported to be taking place. He was in a marked patrol car, but had not activated his siren or emergency lights. He was the first officer on the scene.

Ramos claimed he saw about ten people engaged in an argument, but admitted no one was physically fighting. He shone his spotlight on the group for a few seconds before getting out of the car to get their attention but testified "[t]hey continued arguing and screaming and hollering at each other as if I wasn't there." Ramos claimed he drew his weapon as he neared the group when he saw plaintiff, the only male present, raise a large piece of cement, which Ramos estimated to be between eighteen and twenty-nine inches across, over his head with both hands.

He testified he "either told [plaintiff] to put it down, drop it or something along those lines several times. He didn't and I shot him twice in the torso. Then, when I shot him, he turned and looked at me for the first time and then fell onto the ground." One of the dispatched officers heard the shots as his unit arrived on the scene. A security video from a nearby

business documented that one minute and ten seconds elapsed between the time Ramos arrived and the other police cars appeared.

Defendants presented Emanuel Kapelsohn "as an expert in the field of firearms, police training, crime scene reconstruction, and use of force, including deadly force by police." Mr. Kapelsohn, while opining that Ramos' use of force was reasonable, also testified he did not "accept what [Ramos is] saying, [about the size of the rock] because clearly [plaintiff] didn't pick up a piece of concrete that was 18 to 24 inches across." The expert testified that police officers in stressful situations commonly experience tunnel vision, causing them to misperceive the size of a weapon.

When asked specifically by defense counsel about Ramos' testimony that plaintiff was holding a rock "estimated at 18 to 29 inches," and how the expert "could explain that perception under these circumstances," the expert replied, "[t]unnel vision and the stress effect of being involved in a deadly force confrontation." The expert told the jury that "[a]s long as it was objectively reasonable for Officer Ramos to perceive a rock large enough to cause serious bodily injury to someone," the actual size of the rock would have no bearing on his opinion that Ramos' use of deadly force was justified.

A-4627-13T4

The jury did not hear other explanations for what defendant's expert accepted as Ramos' clear misperception of the size of the rock plaintiff was holding. Specifically, as a result of an in limine ruling barring plaintiff from making any reference to Ramos' psychological records, the jury did not learn that Ramos had eighteen months before been placed on light duty, relieved of his service weapon and discharged from the SWAT team after experiencing nightmares following the shooting of a fellow officer.

The psychologist the City referred Ramos to for a fitness-for-duty exam in May 2007 expressed a "wide variety" of concerns about Ramos including "anxiety and tension, sleep disturbance . . . feelings of depression . . . [and] indications of potentially problematic anger and alcohol use." The psychologist concluded at that time that Ramos' "apparent difficulties functioning could compromise the quality of his judgments in risky or sensitive situations." Ramos was dismissed from the SWAT team by the department's command staff effective July 26, 2007 as "a preventative measure in the best interest and well-being of yourself and other members of the SWAT team."

Although returned to full duty in July 2007, Ramos continued to treat with a social worker through the shooting in

January 2009.  The social worker's notes reflect that Ramos was still suffering from nightmares in which he dreamed he was shot by a citizen or in turn shot and killed an unarmed person, at the time he shot plaintiff.  In the month before the shooting, Ramos crashed his patrol car into a tree in a parking lot, leading the social worker to conclude, "[h]is concentration is off.  He hit a tree the other day in a police vehicle." Unbeknownst to the jury, Ramos filed for a disability pension two weeks before he shot plaintiff.  He has not worked as a police officer since his encounter with plaintiff.

The two issues we discuss both arose out of evidentiary rulings at trial.  We review a trial court's evidentiary rulings for abuse of discretion, Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008), and disregard any error we deem harmless.  Higgins v. Owens-Corning Fiberglas Corp., 282 N.J. Super. 600, 609 (App. Div. 1995).  Only those errors "clearly capable of producing an unjust result," will result in a reversal of a jury verdict.  R. 2:10-2.

At trial, the parties sparred over whether defendants would be allowed to admit the testimony of the assistant prosecutor who determined that Ramos would not be prosecuted.  Plaintiff made a mid-trial motion to bar the testimony, which was opposed by defendants.  After reviewing plaintiff's brief in support of

the motion and hearing oral argument, the trial judge ruled that Assistant Prosecutor Smith could not testify to his reasons for not prosecuting, but could testify to his decision not to prosecute:

> The conclusion was Mr. Ramos is not going to be prosecuted. And as [plaintiff's counsel] said a few minutes ago, if you want to ask Mr. Ramos were you ever prosecuted for shooting Mr. Velazquez, he has no objection to that question. But that's a far cry from saying officer — or rather Assistant Prosecutor Smith can put before this jury four pages of opinions as to what happened, when those opinions are based on selected statements by others. Hearsay. He's not an expert witness.
>
> Again, if he was qualified and called . . . as an expert witness, he'd be permitted to express opinions. But simply because he came to some opinions in deciding not to prosecute, that's not enough to get all those opinions before this jury.

The court then ruled, over plaintiff's objection, that, "The only question I will permit to Greg Smith is: was Ramos prosecuted for shooting Velazquez; yes or no? Period. No further questions." The court rejected defense counsel's request to "go over [Smith's] background," instead making clear counsel was to elicit only the witness's name and job title and nothing else.

Ramos' counsel's direct examination of the assistant prosecutor proceeded in pertinent part as follows:

Q. Mr. Smith, are you currently employed?

A. No, I'm presently retired.

Q. Okay. And where are you retired from?

A. Camden County Prosecutor's Office.

Q. When were you first employed by the Camden County Prosecutor's Office?

A. I was —

[Objection.]

COURT: Very, very, very briefly. Go ahead.

Q. How long did you work for the Prosecutor's Office? From when to when?

A. September 1st, 1983 to November 30th, 2009, 26 years and four months.

Q. Okay. What was your position?

A. From April of 1994 through . . . my retirement date, I was a supervising attorney in the Homicide Unit, first as a Deputy Section Chief, and then from January 2006 to my retirement at the end — the end of '09 I was a Section Chief.

Q. Okay. Does that unit become involved in police shootings?

A. Yes. If there is any kind of injury or death, our unit is called —

[Velazquez's Counsel]: Your Honor, this is completely different than we discussed yesterday.

COURT: You're cutting very close [counsel].

[Ramos' Counsel]: Yes. And I'm very close to finish[ing].

COURT. Go ahead.

. . . .

Q. And what's your responsibility in the Homicide Unit?

[Objection overruled.]

A. The . . . as Assistant Prosecutor?

Q. As a Section Chief, yeah.

A. Okay. Well, I would review whatever investigation was done. And under the Attorney General Guidelines, I had to make a determination whether —

[Objection sustained; motion to strike granted; jury instructed to disregard last fragmentary comments.]

Q. Is it your responsibility to review the file?

A. Yes.

[Objection overruled.]

Q. Are you familiar with the shooting incident involving [plaintiff]?

[Velazquez's counsel]: Objection.

[Ramos' counsel]: Judge.

COURT: I'll allow it. But ask the question, [counsel].

A. Yes.

Q. Yes. And you reviewed the investigation of the shooting?

11

[Velazquez's counsel]:  Objection.

COURT:  No.  Ask the question that I advised you I will permit you to ask.

Q.   Okay.  Upon — based upon that review what was your conclusion?

[Velazquez's counsel]:  Objection.

COURT:  No.

[Velazquez's counsel]:  Move to strike.

      . . . .

COURT:  No. No.  You can ask one question. I told you what the question was that I would permit.  We went through this and spent several minutes on it yesterday.

[Ramos' counsel]:  Judge, I -

COURT:  No.

[Ramos' counsel]:  Can we [have] a sidebar on this?

COURT:  No.

[Ramos' counsel]:  Please?

COURT:  No, no.

[Ramos' counsel]:  All right.

COURT:  We've done it.  We've already argued it out.

Q.   Did you make a determination as to whether you would — Mr. Ramos would be criminally prosecuted?

A.   Yes.

A-4627-13T4

Q.   And what was that determination?

A.   We did not prosecute.

Plaintiff contends Smith's testimony should not have been admitted as lay opinion under N.J.R.E. 701[3] and whatever relevance it had was substantially outweighed under N.J.R.E. 403 by its "severe and undue" prejudice to plaintiff.  We agree.

In American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321, 323-25 (3d Cir. 1985), a declaratory judgment case in which the insurer disclaimed coverage on the basis of arson, the Third Circuit held that admitting "evidence of non-prosecution for arson" was reversible error.  The court explained:

> The evidence of non-prosecution is of very limited probative value in showing that there was no arson because of the higher burden of persuasion in a criminal case. . . .  Further, prosecutorial discretion may take into account many other factors not relevant in a civil suit.  At best, the evidence of non-prosecution is evidence of an opinion by the prosecutor. The opinion of a layperson, as the prosecutor was in this case, however, is

---

[3] N.J.R.E. 701 provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.

> inadmissible if it [is] based on knowledge outside the individual's personal experience.
>
> . . . .
>
> The inadmissibility of evidence of non-prosecution also comports with the general rule that evidence of an acquittal in a criminal arson case is inadmissible in a civil arson case.
>
> [Id. at 325 (internal citations omitted).]

In reaching its conclusion, the American Home court relied on Galbraith v. Hartford Fire Insurance Co., 464 F.2d 225, 227 (3d Cir. 1972), in which the circuit court had applied New Jersey law to hold inadmissible, evidence that a litigant accused of committing arson was not criminally charged. Although finding no New Jersey case squarely on point, the Galbraith court noted "New Jersey law indicates clearly that evidence of an accused's acquittal in a criminal proceeding is not admissible in a civil suit arising out of the event which formed the basis of the criminal charge." Ibid. The court explained:

> The reasoning behind the exclusion of such proffered evidence is readily apparent. An acquittal in a criminal prosecution is not necessarily a judgment of innocence, but merely a negative statement that the quantum of proof necessary for conviction had not been presented.
>
> Similarly, in the context of a civil action for malicious prosecution, New Jersey

14

> courts have consistently held that the grand jury's refusal to bring a bill of indictment is, as evidence, only res inter alios acta as to the question of whether probable cause existed to bring the complaint. Stein v. Schmitz, 137 N.J.L. 725 (E. & A. 1948); Shoemaker v. Shoemaker, 11 N.J. Super., 471 (App. Div. 1951). "The grand jury is not the proper tribunal to try the issues involved in the civil suit, and the issue [raised] by it in refusing to find a bill is not the real issue . . . presented in the civil action. . . . The general rule is that the record in a criminal proceeding is inadmissible in evidence in a civil suit." Stein, supra, 137 N.J.L. at 727 (quoting Apgar v. Woolston, 43 N.J.L. 57, 64 (Sup. Ct. 1881)).
>
> [Ibid.]

Similarly, in Johnson v. Elk Lake School District, 283 F.3d 138, 147 (3d Cir. 2002), the Third Circuit explained that defense counsel's comment in an opening statement that the defendant had never been prosecuted for sexual assault, in a civil suit seeking damages for sexual assault, was improper. The court explained that evidence of "non-arrest, like evidence of non-prosecution or acquittal of a crime, is generally inadmissible in a civil trial concerning the same incident," because of the different burdens; and that the "decision not to arrest may take into account many factors irrelevant to a civil suit, such as the allocation of law enforcement resources and other considerations of prosecutorial discretion." Ibid. Because the probative value of such evidence is so limited,

15

"courts exclude it in order to avoid the danger of the jury in a civil trial exaggerating its worth."[4]  Ibid.

We agree with the Third Circuit's view of New Jersey law on this point.  The defense presented Assistant Prosecutor Smith's testimony, as made obvious by the questions put to him, to tell the jury that the chief of the homicide unit, who was responsible to review the investigation of the shooting under the Attorney General's Use of Force Policy, determined not to criminally prosecute Ramos.  The obvious import of that testimony was that the prosecutor believed Ramos' shooting of plaintiff was lawful as a justifiable use of force under the circumstances.

Assistant Prosecutor Smith, however, did not witness the shooting, and thus his opinion was clearly inadmissible under the lay opinion rule, N.J.R.E. 701, because it was not based on actual knowledge acquired through the use of his senses.  See State v. McLean, 205 N.J. 438, 456-57 (2011) (noting the requirement of N.J.R.E. 701 that lay opinion be based on perception of the witness "rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or

---

[4] Although finding the reference to the lack of arrest improper, the court deemed reversal unwarranted in Johnson because the comment was made in counsel's opening and thus "was never formally admitted into evidence," and the trial judge gave a prompt curative instruction.  Id. at 147-48.

hearing"); <u>Gonzales v. Hugelmeyer</u>, 441 <u>N.J. Super.</u> 451, 460 (App. Div.) (applying same principles in civil case), <u>certif. denied</u>, 223 <u>N.J.</u> 356 (2015); <u>see also</u> Biunno, Weissbard & Zegas, <u>Current N.J. Rules of Evidence</u>, comment 1 on <u>N.J.R.E.</u> 701 (2016) ("The opinion of a county prosecutor that a suspect had not committed arson is not admissible at a subsequent civil trial on that issue because his opinion would not be based on personal knowledge.").

Defendants do "not dispute the general proposition that evidence of non-prosecution in a criminal matter is not admissible to show 'innocence' or 'non-liability' in a civil matter on account of the different burdens of proof."  Instead they argue that plaintiff's counsel "opened the door" to Smith's testimony by remarking in his opening statement that this was "an attempted homicide investigation."

The law is well settled, however, that "[o]pening statements are not evidential and should not be responded to by 'rebuttal' evidence.  If improper remarks are made by counsel, the remedy lies in a curative instruction to the jury or, if absolutely necessary, a mistrial."  <u>State v. Anastasia</u>, 356 <u>N.J. Super.</u> 534, 543 (App. Div. 2003).  "[A]n improper or erroneous statement made on opening is not properly corrected by allowing the introduction of prejudicial evidence that would otherwise be

inadmissible." Ibid. Because we reject defendants' argument that the testimony, even if ordinarily inadmissible, was properly admitted here as rebuttal evidence, we consider whether the error was harmless.

At argument on plaintiff's motion for a new trial, the trial judge acknowledged that Smith's testimony "went beyond the limited scope that the court ordered." He nevertheless denied the motion based on "corrective instructions to the jury." The parties have not identified any curative instruction to the jury on this point, and our own review has failed to identify one.[5]

We are not convinced, however, that a curative instruction, even were one given, could have undone the damage to plaintiff's case by Ramos' counsel's questioning of Smith, particularly in light of the court's ruling disallowing reference to Ramos' mental health records. In this we rely on the trial judge's assessment of the evidence in the record in denying Ramos' motion for dismissal at the close of plaintiff's case.

Carefully canvassing the facts in the record, the judge described the two scenarios presented to the jury of the events of the night of the shooting.

---

[5] Counsel confirmed for us at oral argument that the court did not give a curative instruction, although obviously believing one was appropriate and that it had done so.

One scenario would be that the officer, Officer Ramos, arrived at the scene, put his spotlight on, shined it on the participants in this melee, that that was ignored. He then got out of his vehicle, went toward the group — that's apparently consistent with five or six women and Mr. Velazquez — yelling at them or commanding them to stop, to let him know, tell him what was going on. That his commands were ignored. That he got to the vicinity of the left front fender of the motor vehicle that was parked there, when he observed Mr. Velazquez pick up a rock or stone, or let's call [it] a brick, since it's an artificially made landscaping ornament. They generally run 16, 18 inches long, maybe 8 or 10 inches high, scalloped. And there were several of them around the tree.

The officer saw Mr. Velazquez pick up one of these pavers, bricks — call them bricks — picked up one of these bricks, held it over his head, and appeared to start moving forward as if he were going to throw it at someone. His girlfriend's sister was in the vicinity near the van. She had apparently thrown a rock at him and, in retaliation, he picked up a large brick paver and started to throw it at her or looked like he was going to throw it at her or possibly the woman next to him, [who] as it turns out was his mother, but that would not have been known to the officer at the time.

And if that were the scenario, and the officer yelling and hollering stop, put it down, don't do it; his commands being ignored by Mr. Velazquez; a jury certainly could conclude and, indeed, if they were the only facts, a court could probably conclude as a matter of law that at that point in time it was objectively reasonable for Mr. Ramos or Officer Ramos to discharge his

19

weapon to protect, if not himself, certainly the other people in the vicinity.

Another scenario, however, that this jury could come to, based on the facts that have already been testified to, is that the [girlfriend's sister] threw the rock — threw a rock at Mr. Velazquez. The rock was small in size, two to four inches; small enough to be held in the palm of a hand, certainly in the palm of a woman's hand. And then that was — that rock was thrown at him. That his mother, who was standing by his side, deflected the rock so that it didn't hit him. That he then bent down, sort of a natural reaction to having a rock thrown at him, bent down to pick up the rock without any clear intention as to what he was going to do with it. That, as he was straightening up with the rock either at his waist or perhaps chest high, but not in an overhead throwing motion, that he was simply standing up after having grasped the rock, that the officer without warning, drew his service revolver and shot Mr. Velazquez in two places, two times in the torso.

Under that scenario, which is a scenario that this jury could very well come to given the evidence before them, they could then make the determination that the conduct was not objectively reasonable. And if that conduct was not objectively reasonable, no matter what was in Officer Ramos' mind at the time, if they were — if that was the factual scenario, then he would lose any immunity and be liable for the injuries to Mr. Velazquez.

Having reviewed the record ourselves, we conclude the judge very ably summed up the two different factual scenarios confronting this jury. The case obviously presented a pitched credibility battle regarding the events taking place over the

20

course of the seventy seconds that elapsed between Officer Ramos' arrival and plaintiff's shooting.

The decision for the jury was whether Officer Ramos' act of shooting plaintiff was an objectively reasonable use of deadly force to protect himself or others from an imminent threat of serious bodily harm. Stated differently, they had to decide whether they accepted the officer's version presented by the first scenario or plaintiff's version presented by the second. Having the head of the homicide unit in the prosecutor's officer offer his opinion that Ramos should not face criminal charges based on the investigation conducted, in our view impermissibly risked tipping the scales on that very close question in defendants' favor.

As the Supreme Court noted in analogous circumstances, "[a] jury may be inclined to accord special respect to such a witness." Neno v. Clinton, 167 N.J. 573, 586 (2001) (addressing impropriety of having police officer offer his opinion on the cause of an accident based on the hearsay statements of witnesses testifying in the action). It could not have been lost on this jury that had the prosecutor found the civilians' account of the shooting credible, instead of Ramos', that Ramos would have likely been criminally prosecuted. At the very

least, it impermissibly bolstered the officer's version of events.  See State v. R.K., 220 N.J. 444, 458 (2015).

"For a hearsay error to mandate reversal, '[t]he possibility [of an unjust verdict] must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'"  Neno, supra, 167 N.J. at 586 (quoting State v. Hightower, 120 N.J. 378, 410 (1990) (quoting State v. Bankston, 63 N.J. 263, 273 (1973))).  Having reviewed the record of this trial, we are convinced that admitting Assistant Prosecutor Smith's testimony was an error of that magnitude.

Smith testified that as chief of the homicide unit he was called upon to review any investigation of a police shooting involving injury or death and, after reviewing the investigation conducted in this matter, he determined not to criminally prosecute defendant Ramos.  The jury could very well "have ascribed almost determinative significance to that opinion, which went to the heart of the case."[6]  Id. at 587.  Because the improperly admitted testimony was "clearly capable of

---

[6] As is obvious from the discussion, this testimony should not be repeated at any retrial.  In addition, the trial judge should consider explaining to the jury that whether Ramos was criminally prosecuted is irrelevant to the issues in the civil trial.  The judge may also wish to consider, in consultation with the parties, inquiring into potential jurors' views of the

(continued)

producing an unjust result," R. 2:10-2, especially when coupled with the decision to preclude any reference to Ramos' mental health records, to which we turn now, reversal is required.

Defendant Ramos made a motion before trial to bar any mention of Ramos' state of mind, including psychological counseling. Cf. N.J.R.E. 534 (effective July 1, 2016) (codifying a new uniform mental health privilege affecting the admissibility of patient communications with mental health providers along with several exceptions). The trial judge granted the motion finding that "Officer Ramos' private mental health or his information is not necessary to determine whether his use of force against the plaintiff was constitutional. . . . His mental state has no bearing on whether his actions were objectively reasonable under the circumstances."[7]

---

(continued)
issue in voir dire in light of the recent national press coverage of such shootings.

[7] Plaintiff makes much of the fact that when this case was first tried, a different judge denied a similar in limine motion to bar reference to Ramos' psychiatric records. That first trial ended in a mistrial after multiple weather-related court closures made it impossible for a sufficient number of jurors to continue. Because nothing prohibited the second judge from revisiting the issue, we do not address it further. See Lombardi v. Masso, 207 N.J. 517, 538-39 (2011) (noting "[a] hallmark of the law of the case doctrine is its discretionary nature, calling upon the deciding judge to balance the value of judicial deference for the rulings of a coordinate judge against those factors that bear on the pursuit of justice and,

(continued)

A-4627-13T4

Defendants devote the greater part of their briefs to defending the unassailable proposition that excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard, Graham v. Connor, 490 U.S. 386, 388, 109 S. Ct. 1865, 1867-68, 104 L. Ed. 2d 443, 450 (1989), and thus that Officer Ramos' "subjective state of mind is irrelevant to a proper assessment of the standard of objective reasonableness under the Fourth Amendment."

We certainly agree that the substantive question in excessive force cases "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397, 109 S. Ct. at 1872, 104 L. Ed. 2d at 456; see also Tumpson v. Farina, 218 N.J. 450, 474 (2014) (noting interpretation given to parallel provisions of 42 U.S.C.A. § 1983 provides guidance in construing our Civil Rights Act).

As the United States Supreme Court has explained, "[a]n officer's evil intentions will not make a Fourth Amendment

_____

(continued)
particularly, the search for truth") (internal quotation omitted).

violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  Graham, supra, 490 U.S. at 397, 109 S. Ct. at 1872, 104 L. Ed. 2d at 456.

But defendants' forceful defense of the trial court's ruling prohibiting any reference to Ramos' mental health records is a "straw man" argument,[8] because plaintiff has never sought to use the records to challenge Ramos' subjective motivation in firing on him.  Instead, plaintiff sought to use the records to challenge Ramos' perceptions and his ability to make observations, a classic use of extrinsic evidence to impugn a witness's credibility under N.J.R.E. 607.  See State v. Johnson, 216 N.J. Super. 588, 603 (App. Div. 1987) ("any deficiency of the senses which would lessen the ability to perceive facts testified to by the witness is an attack on the credibility of the witness"), certif. denied, 157 N.J. 647 (1987).

---

[8] See Kaye v. Rosefielde, 432 N.J. Super. 421, 478, n.30 (App. Div. 2013) (explaining that "the technique of setting up an argument that does not exist and then refuting that misrepresented argument is called the 'straw man' fallacy") (quoting Canesi v. Wilson, 158 N.J. 490, 518 (1999) (O'Hern, J., concurring)), rev'd on other grounds, 223 N.J. 218, 238 (2015).

Our Supreme Court has recognized that an officer's account of the facts is relevant in excessive force cases. Although an officer's conduct

> is to be evaluated through an objective lens that focuses on what a reasonable officer would have done under the circumstances . . . [,] [t]his is not to say that the law enforcement officer's version of events is irrelevant. On the contrary, the law enforcement officer of course may argue that the <u>facts</u> that existed at the time of the incident are different from the plaintiff's version.
>
> [<u>DelaCruz v. Borough of Hillsdale</u>, 183 <u>N.J.</u> 149, 166 (2005).]

Conversely, plaintiff must be allowed to challenge the officer's version of the facts, including through the use of extrinsic evidence to impeach his credibility.

Our courts have held in a variety of other contexts that evidence of a witness's mental state or condition is relevant to assess credibility and explain the witness's conduct. In <u>State v. Burr</u>, 195 <u>N.J.</u> 119, 123 (2008), the Court found that evidence that a defendant charged with sexual assault suffered from Asperger's Disorder should have been admitted because it was material to his explanation of himself and his conduct. The Court stated that "evidence of mental defect, illness, or condition has been admitted . . . to assess

credibility or otherwise evaluate the subjective perceptions of an actor."  Id. at 128.

In Johnson, supra, 216 N.J. Super. at 603, we explained that "evidence of a witness' sensory or mental defects has unquestionable relevance in attacking a witness' credibility." We held mental abnormality, including being under the influence of drugs or alcohol "at the time of observing the facts is provable on cross-examination or by extrinsic evidence bearing on credibility."  Ibid.; see also Jaffee v. Redmond, 518 U.S. 1, 3-10, 116 S. Ct. 1923, 1925-28, 135 L. Ed. 2d 337, 341-45 (1996) (acknowledging in adopting psychotherapist-patient privilege that a police officer's mental health records in a civil rights suit accusing the officer of excessive force in shooting plaintiff's decedent would be probative of the officer's conduct and perceptions at the scene).

In State v. Franklin, 52 N.J. 386, 399-400 (1968), the Court held that the trial court's restriction of defense counsel's cross-examination of a critical witness in a homicide prosecution on her alcoholism was reversible error.  The Court held the error deprived the jury of "the benefit of what we now know of [the witness's] drinking habits, the physical and mental effects of alcohol upon her (including hallucinating), and her

hospital admissions, so that it could reach an informed judgment as to whether her testimony was to be believed." Id. at 399.

Similarly, in State v. Wormley, 305 N.J. Super. 57, 65-67 (App. Div. 1997), we held that it was reversible error to prohibit the defendants from inquiring into a witness's drug use to attack his credibility. We reiterated that a defendant in a criminal trial "is entitled to fully test the State's proofs by challenging a witness's perceptions and his ability to make observations." Id. at 66. Because the witness's testimony was inconsistent with other evidence, we acknowledged that the "defendants were able to cast some question upon [the witness's] credibility through these peculiarities in his testimony and his prior convictions." Id. at 68. We noted, however, our conviction "that whereas the jury might have had some question as to his observations based upon all of that, cross-examination of his drug use may well have tipped the scales." Ibid.

The clear import of all of these cases is that a witness is always subject to cross-examination on his ability to accurately perceive the facts to which he has testified. The accuracy of the witness's observations and perceptions is central to an assessment of the witness's credibility. Although the trial court was correct that evidence of Ramos' nightmares, anxiety and tension, sleep disturbance and lack of concentration would

not be admissible to establish his subjective intent or motivation, as such is not relevant to an excessive force claim, see Graham, supra, 490 U.S. at 397, 109 S. Ct. at 1872, 104 L. Ed. 2d at 456, that was not the purpose for which the evidence was offered.

Ramos' nightmares, anxieties and tensions, sleep disturbances and lack of concentration were relevant, and thus admissible, to assess his credibility and evaluate his subjective perceptions of the threat plaintiff posed. See Burr, supra, 195 N.J. at 128. "A party may introduce extrinsic evidence relevant to credibility, whether or not that extrinsic evidence bears upon the subject matter of the action." Johnson, supra, 216 N.J. Super. at 603.

Interpreting the "objective reasonableness" standard for evaluating excessive force claims so expansively as to preclude a cross-examiner from probing whether the officer's psychiatric symptoms affected his ability to accurately perceive the events giving rise to the claim, we are convinced was error. Such an interpretation risks creating a special rule of credibility for police officers defending against excessive force claims, shielding them from the ordinary rules of cross-examination. Nothing in our case law supports such an interpretation. See DelaCruz, supra, 183 N.J. at 166-67.

Whether Officer Ramos' act of shooting plaintiff twice in the torso was objectively reasonable depends entirely on how a reasonable officer would have perceived the threat plaintiff posed.  See id. at 166.  That, in turn, likely depended on whether the jury believed plaintiff simply picked up a small two to four inch rock thrown at him in the course of a loud argument, as plaintiff and the other witnesses testified, or whether he was menacing the women with a large eighteen to twenty-nine inch piece of cement he held in both hands over his head, as Ramos claimed.

In deciding which scenario they accepted, the jurors should have been informed that there were reasons other than the tunnel vision offered by defendants' expert to explain why Ramos may have seriously misperceived the size of the rock plaintiff was holding and thus the magnitude of the threat he posed. Plaintiff should have been permitted to tell the jury that Ramos had eighteen months before been placed on light duty after experiencing nightmares following the shooting of a fellow officer and discharged from the SWAT team after a psychologist concluded that Ramos' "apparent difficulties functioning could compromise the quality of his judgments in risky or sensitive situations."  Plaintiff's counsel should have been able to

A-4627-13T4

cross-examine Ramos about his symptoms and their effect on his perceptions and the performance of his duties.

Because the court's ruling barring any reference to Ramos' mental health records severely prejudiced plaintiff in his ability to prove his excessive force claim against Ramos and gutted his Monell[9] claim against the City, we reverse the verdicts in defendants' favor and remand for a new trial as to both defendants.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611, 636 (1978). Under Monell, "[a] municipality can only be held liable for constitutional violations committed by an employee when the violation resulted from an official municipal 'policy or custom.'" Stomel v. City of Camden, 383 N.J. Super. 615, 627 (App. Div. 2006) (quoting Schneider v. Simonini, 163 N.J. 336, 371 (2000), cert. denied, 531 U.S. 1146, 121 S. Ct. 1083, 148 L. Ed. 2d 959 (2001)), aff'd in part, rev'd in part on other grounds, 192 N.J. 137 (2007). Barring any reference to Ramos' mental health records prevented plaintiff from presenting evidence that the City's policies for evaluation and treatment of the mental health of its officers resulted in "deliberate indifference to the rights of persons with whom the police come into contact" and were the "moving force" behind Ramos' use of excessive force against plaintiff. City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412, 426 (1989).

A-4627-13T4